MORRIS v. WILLIAMS et al.

Civil Action No. 555.

District Court, E. D. Arkansas, W. D.

Jan. 5, 1944.

Scipio A. Jones, J. R. Booker, and Myles Hibbler, all of Little Rock, Ark., and Thurgood Marshall, of New York City, for plaintiff.

Rose, Loughborough, Dobyns & House and William Nash, all of Little Rock, Ark., for defendants.

TRIMBLE, District Judge.

This action was instituted by and in the name of Susie Morris, for herself and others similarly situated, and by the City Teachers Association of Little Rock, Arkansas, an unincorporated association, against Robert M. Williams, Chairman, and the several other members of the Board of Directors of the Little Rock Special School District, and Russell T. Scobee, Superintendent of schools for the District. Upon motion of the defendants, after argument of counsel and submission of briefs, the City Teachers Association was dismissed as party plaintiff and the cause proceeded in the name of Susie Morris, as plaintiff for herself and on behalf of those other persons similarly situated and affected.

Plaintiff alleges as follows: She is colored, a person of African descent, and of Negro blood; is a taxpayer of the City of Little Rock and State of Arkansas; is a teacher by profession and training, regularly employed in a public high school maintained and operated by defendants; that defendants, over a long period of years, have consistently pursued and maintained a policy, custom and usage of paying colored teachers and principals less salary than white teachers and principals in the system, possessing the same professional qualifications, licenses and experience, exercising the same duties and performing the same services as colored teachers and principals; that such discrimination is being practiced against the plaintiff and all other colored teachers and principals in the system based solely upon race and color; that by rules, regulations, practice, usage and custom of the state acting by and through defendants the plaintiff and all other colored teachers and principals in the system are being denied the equal protection of the laws, in that solely by reason of their race and color they are being denied compensation from public funds for their services as teachers equal to that being paid to white teachers with equal qualification and experience for equivalent services, pursuant to rules, regulations, custom and practice of the State acting by and through its agents and agencies. She alleges that she has to satisfy the same requirements as those expected of all other teachers, while or colored; that she exercises the same duties, and performs services substantially equivalent to those performed by other holders of a like license, and that notwithstanding this all white teachers in the system holding a like license with less or equal experience receive larger salaries than does plaintiff.

She then alleges: "Pursuant to the policy, custom and usage set out above the Defendants acting as agents and agencies of the State of Arkansas, have established and maintained a salary schedule used by them to fix the amount of compensation for teachers and principals in the public schools of Little Rock which provides a lower scale of salaries for Negro teachers and principals than for white teachers and principals with equal qualifications and experience and performing essentially the same duties; the practical application of this salary schedule has been, is, and will be to pay Negro teachers and principals of equal qualifications, licenses and experience with white teachers and principals less compensation

from public funds solely on account of race and color."

It is then alleged that by reason of these things being done, solely on account of race and color, the plaintiff Susie Morris, and all others similarly situated and affected, are denied the equal protection of the laws and due process clauses of the Fourteenth Amendment to the United States Constitution, and that in enforcing said discriminatory system and schedule defendants' acts are the acts of the State, and are void and unconstitutional.

She then sets out that: "By virtue of the discriminatory salary schedule for teachers established and maintained by the defendants, hereinbefore set forth * * *, and the custom set out * * * the plaintiff is denied an equal and proportionate participation in the benefit derived from that portion of her taxes devoted to the public school fund and the payment of teachers' salaries therefrom; she is denied said equal and proportionate participation in said benefit and return solely on account of race and color," all of which she says is contrary to the provisions of the Fourteenth Amendment to the Constitution of the United States; that she has suffered special damage, and is without remedy save this court issue a writ of injunction as prayed. She then makes other supporting allegations not necessary to be set forth.

Her prayer is for a declaratory judgment and injunction.

Defendants filed an answer denying some of the allegations and admitting some, so that the issues are squarely joined upon three propositions:

(1) The existence of a schedule of salaries by which the plaintiff and those similarly situated and affected are discriminated against solely on account of race and color;

(2) A policy, custom or usage to pay to colored teachers and principals less salary and compensation solely on account of race and color; and

(3) The constitutional question raised by the pleadings.

These questions will be considered in the order above set out.

As in all cases of a civil nature the burden is upon the plaintiff to establish her case by a fair preponderance of the evidence. The evidence in the case is very voluminous and it would serve no useful purpose to include a summary of it in this opinion, and it has been clearly and succinctly set forth in the abstract filed by the defendants.

The Little Rock Special School District is a part of the public school system of the State of Arkansas, provided by the state pursuant to the mandate in the State Constitution, and to that extent constitutes a state agency. The defendant directors are elected to their office by the voters of the city, and serve without pay. They have the duty and authority to employ such supervisory officers, teachers, employees and servants as may be required to operate the schools efficiently and properly. They are charged with the financial affairs of the district, receive the funds and pay them out in accordance with the law.

In the performance of their duties they have the duty to employ the best fitted persons obtainable for each position to be filled, within the statutory and constitutional limitations. In employing personnel they have the duty and responsibility of investigating the qualifications of the applicants and fixing their compensation if employed, to assign their duties and provide supervision of their work. They have the right to and duty to discharge any teacher whose work they consider unsatisfactory, or under the law they may discharge a teacher for any reason which the directors deem sufficient. They have the right and authority to reclassify and change the rate of salary of any or all teachers within the exercise of their best judgment. They may also refuse or fail to execute a new contract at the expiration of the old, and their action in such case is final, whatever their reason for so doing. 24 R.C.L. page 613; Seattle High School, etc., v. Sharples, 159 Wash. 424, 293 P. 994, 996, 72 A.L.R. 1215; People ex rel. Fursman v. City of Chicago, et al., 278 Ill. 318, 116 N.E. 158, 160, L.R.A.1917E, 1069.

The directors, in carrying out their duties, have employed a general superintendent, and have assigned to him the customary duties of such a position. With only one exception the individual members of the Board of Directors are without experience in the teaching profession, and they rely to a very great extent upon the advice of the superintendent in the operation of the schools, and especially in the selection and employment of teachers, and renewal of contracts. Mr. Scobee, the Superintendent here, came to the system on February 1, 1941, hence at the time suit was instituted had been with the system just

over one year. He has testified at length as to his training and experience, not only as a teacher, but as a trained and experienced school administrator, and more particularly as to his experience in employing and rating teachers, determining their value as teachers, and fixing their compensation, which work he began in 1923.

Within the system are employed supervisors who visit the schools, observe the teachers and advise with them in their work, assist them in improving their teaching methods, and who report to the superintendent their observations and suggestions for improvement. At the request of the superintendent or board they make rating sheets, on which they rate the individual teachers under their supervision for certain qualifications and abilities. These rating sheets are in turn assembled into one rating by the superintendent or under his directions, and the information gotten in this way is considered by him. Some of these rating sheets have been introduced in evidence over the objection of plaintiff. The supervisors in preparing these rating sheets did not know the salary the teacher was receiving, and the ratings were not prepared with the fixing of salaries in view.

It has not been the practice according to the evidence before the court, as in some of the reported cases, for the principals of the schools to rate the teachers under them and for the individual teachers to rate the principal of the school. Such a practice would, to say the least, cast grave doubt on the value of the ratings. A partial exception to this practice was in the white senior and junior high schools, and for those schools the system does not provide supervisors, and there the principals would rate the teachers, if such ratings be made.

(1) Plaintiff in support of her allegations of a schedule of salaries by which she has been discriminated against has herself testified and has introduced into the record two documents which she contends support her evidence and allegations. The other evidence as to a salary schedule is that of the superintendent and individual directors.

Plaintiff has introduced from the minutes of the Board a recommended schedule, submitted by the Executive Committee of the Teachers Organizations under date of July, 1937, which was "approved" by the Finance Committee, on January 31, 1938, and "adopted," which contains the following provisions: "The schedule for new teachers shall be Elementary $810; Junior High $910; Senior High $945." It is difficult to tell from a perusal of this exhibit whether it is a schedule of salaries, a schedule of adjustments or both, and if both where they merge.

If this is the schedule of salaries upon which plaintiff relies, standing alone it completely refutes her contention, as there is not one word therein even suggesting that white teachers and colored teachers were to be paid a different rate of salary. Furthermore at the time plaintiff filed her suit she knew nothing of this document and only discovered it when given access to the records of the Board. The evidence in this case clearly discloses that this "recommended salary schedule" was not followed nor observed, as the records show that many teachers, both colored and white, were employed at salaries entirely different from those mentioned in this so-called schedule.

However, it is plaintiff's contention that this was, in fact, if not in words, a schedule for white teachers, and that Plaintiff's Exhibit No. 4 designated "Special Adjustment Plan Negro Teachers, May 1940," was the schedule adopted for colored teachers. This document plaintiff testified she found in her box at the Dunbar High School where she teaches, in the place where she found other official communications. There is nothing on the face of this document which shows it came from the School Board, was authorized by the defendants, or that it had any official sanction whatsoever. So far as this record is concerned it is an orphan, without father or mother, and no more than a waif laid on plaintiff's doorstep. The plaintiff had access to the records and minutes of the Board, and has introduced in evidence such records and excerpts from the minutes as she desired or saw fit. She has not pointed out to the court any place in those records or minutes where this document was mentioned, was before the board, or was considered or adopted by the board for any purpose. The court by an independent search has not found any mention in the minutes of this Exhibit No. 4, nor anything to fix responsibility for or knowledge of this document upon the directors. The evidence shows that plaintiff's salary and that of some of the other teachers at Dunbar High School, where she is a teacher, are at variance with the provisions of this document, and it is not

shown that the salary of any colored teacher is in accord with it. This is the only schedule of salaries for colored teachers which the plaintiff claims existed. She admits she has never seen a schedule for white teachers, but thinks that the Board must have one, that any Board must have a schedule of salaries.

Mr. Scobee, the Superintendent, testified that when he came to Little Rock to discuss the matter of accepting the superintendency he asked the Board if it had a schedule of salaries and was advised that it did not have; that since his coming he has never seen one, has never been instructed by the Board to follow one, and has not followed a schedule of salaries; that he has fixed the amount of salary he would recommend for each teacher he employed by an investigation of the applicant's capabilities, including all those intangibles which go to make up personality and character, and has had a personal interview with the applicant whenever he deemed it necessary or advisable.

All of the individual members of the Board of Directors were called as witnesses in this case, and each testified they knew nothing of a salary schedule, had never followed one in fixing salaries, and had never instructed the superintendent to follow one in recommending salaries. The three members of the personnel committee of the Board testified they followed no schedule of salaries, knew of none, and were totally unaware of the recommended schedule of 1938, if such it be. Mr. Scobee and Mr. Williams, Chairman of the Board when the suit was instituted, testified positively they never saw Plaintiff's Exhibit No. 4 until they came upon the witness stand and the other directors were not asked about it.

The time when such a salary schedule as the plaintiff alleges and relies on must have existed and been in effect was at the time of the bringing of this action and at the time of the trial of the cause. The Court is of the opinion and so finds that Plaintiff's Exhibit No. 4, "Special Adjustment Plan Negro Teachers, May 1940," was never a salary schedule officially adopted, or promulgated by the defendants here, and was never followed by them. The court does not find that the alleged salary schedule of 1938 which was recommended and apparently adopted was such a salary schedule or was ever put in force and effect. If it ever was a salary schedule in force and effect, under the evidence in this case it was never followed by the Board or Superintendent, as all of them testified positively and without equivocation they never saw, knew or heard of any salary schedule. If it was a salary schedule adopted by the board it makes no distinction between white and colored teachers or principals, and does not bear or tend to bear out plaintiff's contention.

■ After a careful consideration of all the competent evidence adduced at the trial, and giving to all of the competent evidence the weight to which the court believes it is entitled, the Court is of the opinion plaintiff has not met the burden cast upon her, hence finds there is and was no salary schedule in effect at the times pertinent herein.

While plaintiff in her brief has to all intents and purposes abandoned her contention as to the existence of a salary schedule, in force and effect she centers her attack upon (2) the existence of a policy, custom and usage, consistently and persistently maintained by defendants, of discriminating against colored teachers and principals and paying them less salaries than white teachers and principals of equivalent professional qualifications, licenses and experience, who are exercising the same duties and performing the same services as colored teachers and principals, solely on account of race and color. Inasmuch as plaintiff has not pointed out to the court, nor introduced any evidence of any state statute, rule, regulation, custom, usage or policy by which she is discriminated against, her whole contention must rest upon the maintenance of such custom, policy or usage by these defendants.

The custom, usage and policy involved here, and upon which plaintiff must rely, as in the case of a salary schedule, is that existing at the time the suit was instituted and at the time the cause was tried. Evidence of any custom, usage or policy which might have existed at any time prior to these pertinent dates, and especially prior to February 1, 1941, the time when Mr. Scobee, was employed as superintendent, has been admitted for what light it might throw on the conditions existing at the pertinent dates.

Plaintiff's contention that there is a policy, custom and usage in the fixing of salaries of colored teachers below that of white teachers solely on account of race or color is based largely on her belief that

all salaries should be fixed upon the basis of college degrees and years of teaching experience. In her testimony she says the only things to be considered in fixing salaries are the degrees and experience, "and the salary should be based on degrees and years of experience." (Tr. 239, 240, 241.) Dr. John H. Lewis, Principal of Dunbar High School, called as a witness on behalf of plaintiff, testified to the same effect.

Under her theory and testimony she would eliminate all discretion in the defendants as to the amount of salary to be paid the individual teacher, and under her theory, once an applicant was accepted for a position the amount of salary to be paid would be figured with mathematical precision, and would become so much a matter of mathematics that it could readily be reduced to a point where it might be done upon an adding machine.

Unfortunately for this theory human capabilities cannot be reduced to a mathematical formula, for nature has not so endowed the human race. The mind of man is not like a jug into which one may pour so much knowledge and information and pour out a measured amount in return. Nor is it a wax disc upon which can be impressed spoken words which upon the starting of the mechanism is reproduced exactly as the original speech.

Let us carry her theory one step farther and say that when an application is filed for a certain position that it must be given a filing date, and when in the filling of such a position the application is reached in its date order the applicant must be employed at a salary specified by the schedule to fill that position, and that the defendants have no discretion or right to consider character, interest, efficiency, ability to teach, loyalty, or any of those intangibles that enter into the personality of the individual teacher and affect his value to the system. This is no more absurd than to say that the defendants here, the directors and superintendent, in the fixing of salaries, which represents the teacher's value to the system, are to take the degrees plus the years of experience and get the amount of salary to be paid, regardless of character, intelligence, capability to teach and those other intangibles so important in human relations.

It must be remembered at all times that the state by statute, rule or regulation does not require school officials, in fixing salaries of teachers, to fix them solely upon college degrees plus years of experience as teachers. The state has committed to these defendants, the directors, the power and authority and cast upon them the duty of passing upon and determining the qualifications of applicants for teaching positions, and have only prescribed the minimum requirements applicants must meet. It has left defendants free to exercise their judgment and discretion, with no limitation on their authority to take into consideration such other elements as go to the making of personality, and which in their opinion affects the capability of a teacher and the value to the system as a teacher, and they may and should take into consideration many things such as character, disposition, industry, adaptability, and those other intangibles which so vitally affect the work of anyone dealing with those about them, and more especially in the school room. The court is without authority to set up rules or regulations, to set up a system of weights and balances, to prescribe a yardstick for the admeasurement of the qualifications of any individual applicant or teacher, or lay down any method for determining the value of a teacher to the system. This court can only look at what is being and has been done with one object in view, to determine if the teacher, the plaintiff here, and those for whom she brings this action, has been discriminated against solely on account of race and color.

Gathered from all the competent evidence before the court the procedure followed by defendants in the selection of teachers, and of fixing their salaries, is as follows: The applicant files an application on a form prepared by the Board. On this form there are many questions to be answered as to the applicant's qualifications. The answers to these questions include: Age, race, condition of health, condition of eye-sight and hearing, educational and professional training, courses pursued, grades attained, degrees conferred, teaching experience, subjects and grades taught, grade or subject they wish to teach, marital status, number of children, amount of salary they have received, salary they would accept, religious affiliation, and so on.

Attached to this application often there is a photograph of applicant.

When this application is received if the superintendent has such a position to fill,

or if not when he does have, this application is placed before the superintendent and he studies it, along with others. If he feels it is proper or would be helpful to do so, he calls in the applicant for a personal interview. In some cases he corresponds with the college from which the applicant comes, those familiar with the applicant's work, the teachers under whom the applicant studied, and information is also secured from the placement bureau or practice schools where deemed advisable. As noted above the applicant states the salary acceptable and on personal interview this is discussed. This statement by the applicant is not the criterion by which the salary is fixed and the final salary may be more or less than that sum.

The superintendent makes his recommendation to the personnel committee of the board and gives them any information they desire. He advises them what he thinks the teacher will be worth to the system. Ordinarily the personnel committee accepts his recommendation, but they may if they desire, and sometimes do, refuse the recomendation entirely or accept it on other terms. At the next or some meeting of the board the matter is submitted to the board, where it is ordinarily approved without further discussion. Sometimes members of the board ask questions, and sometimes the applicant calls on individual members of the board.

The Superintendent has testified at length, and on extended questioning by the plaintiff on cross-examination, and by defendants on direct, he has stated positively and unequivocally that the question of race and color never enters into and has never entered into his consideration of the salary to be paid the applicant—or teacher; that he has always been aware of the race and color, but he has only considered the value of the individual to the system in the position he had to fill.

As to the teachers already in the system the Superintendent was examined at great length by both parties. He steadfastly refused to consider the teachers in groups of races, or other-wise, but considered them only as individuals, their individual capacities, qualifications and characteristics. Mr. Scobee, the Superintendent, came to the system on February 1, 1941. He states that he substantially maintained the 1941–42 salaries because he had only been here about four months and did not have sufficient information on which to base any extended modification of salaries. Before the 1942–43 salaries could be fixed this suit was filed, and knowing that any change he might make would have been interpreted in the light of this suit, he made very few.

Mr. Scobee has stated positively that in fixing salaries for renewal of contracts it was his policy to recommend what he thought each teacher was worth to the system; that he had made recommendations for higher salaries for individual teachers, and pointed out a colored teacher for whom he made such a recommendation. He was questioned at length as to individual teachers and invited to compare individual colored teachers with individual white teachers, which he did, and was invited to explain any differences in salary between the two. He testified with entire frankness and stated that some white teachers were not getting what they were worth, that some colored teachers were worth more to the system than they were receiving, that some white teachers had been found not to be worth the salary they were receiving, as well as some colored teachers; that as to these their contracts had not been renewed or would not be, and at least some of them were no longer with the system. He frankly stated he had made mistakes in his judgment of both white and colored teachers and applicants, some of whom were no longer with the system.

He testified he is perfectly willing to make recommendations for increase in salary for individual teachers without regard to race and color, but based on their teaching ability and on all other factors which he thinks proper, which he repeatedly enumerated. The court was very much impressed by Mr. Scobee's sincerity, frankness, fairness, his demeanor upon the stand, and the knowledge of school administrative procedures which he evinced in his testimony.

All of the members of the Board of Directors testified specifically that they had never considered race or color in fixing salaries; but that they were aware of race and color of applicant and teacher. The evidence placed before the court in the application forms filed by the applicants shows that they were also aware of many other things about the applicant, such as religious affiliations, place of birth, age, etc. Naturally they were aware of all these things, including race and color but their awareness does not by any manner of

means show they were prejudiced against the applicant thereby.

The Board of Directors is composed of men and women of high standing in the community. Mr. Robert M. Williams, was Chairman of the Board when this suit was instituted, is an insurance executive and has been on the board since March, 1939; Mr. Murray O. Reed, a practicing attorney, since March, 1939; Mrs. W. P. McDermott, a social worker, since March, 1922; Mrs. W. S. Rawlings, a former teacher, since March, 1934; Dr. R. M. Blakely, a practicing physician since March, 1941; and Mr. E. F. Jennings, a business man and automobile dealer, since March, 1941. The court does not deem it necessary to give a summary of their character, or list their qualifications to serve as members of the Board of Directors. But the court does want to say that many of the individual members have been known to the Court personally for many years, and others of them a like period by reputation. All of them are men and women of the highest caliber, civic minded, desiring to serve their community, such as "swear to their own hurt and change not." The court saw them on the witness stand, noted their demeanor, their manner of testifying, and had every opportunity to judge of their frankness, their sincerity and their truthfulness. None of them hesitated to answer any question asked, or sought to evade any fact or issue, and resorted to no subterfuge nor attempted to conceal information from counsel or court.

In addition to the members of the Board of Directors and the superintendent, the court had the benefit of the testimony of the supervisors for the different grades and different subjects. These supervisors were men and women of long experience, who come in contact with a great majority of the teachers, watch them work, advise with them and know the individuals remarkably well. Their testimony supports that of the superintendent in his rating of the individual teachers, and they are the ones who make the rating sheets.

Counsel for plaintiff have pointed out some tables which they have compiled from the evidence in this case. A study of those tables show that there is a variance in the rate of pay between individual teachers as between white and colored. But the evidence also shows on the same basis there is a variance in rate of pay as between white teachers as compared with white teachers, and colored teachers as compared with colored teachers.

There are some pertinent facts that it might be well to note. It was the testimony and contention of the plaintiff that a college degree is a college degree regardless of the school from which it came when considered as a basis for fixing salaries. However, she did not take this attitude consistently, but admitted that a college degree from an accredited college was or possibly should be worth more than one from a non-accredited college. It is a matter of common knowledge, and probably plaintiff's counsel would not contend otherwise, that degrees from accredited schools are considered more important than degrees from non-accredited schools. This is self-evident that it is so regarded, else why the distinction at all? Or why accrediting agencies at all?

From the evidence in the case it appears that none of the Negro colleges in Arkansas are accredited schools. In the system there are 86 colored teachers, of whom 50 do not have degrees from accredited schools, nor did they do their college work in accredited schools. There are approximately 320 white teachers in the system, none of them without degrees from or some work in accredited colleges, with the exception of those teaching cosmetology, automobile mechanics, and other special subjects not included in college curricula.

■ The court is of the opinion that the defendants have a right to fix the salary of each individual teacher in the system, according to their real worth and value to the system as teachers, and are not required to set up and adhere to some arbitrary standard of college degrees and years of experience in teaching, some mechanical method or means of determining salaries. The court is of the further opinion that it is right and proper that they should exercise their discretion and judgment in each individual case, taking into consideration such qualities as they deem proper and essential. They are the ones to whom, under the law and constitution, the state has committed this duty, and as long as they do this without violating the constitutional prohibition, and do not fix these salaries solely on race and color, their discretion and judgment cannot and will not be interfered with by the courts. They are human agencies, hence fallible, and have made mistakes, and been guilty of errors of judgment. This they frankly

admit. But this court is without jurisdiction to review their errors of judgment or discretion, but only their violations of the constitutional prohibitions.

The cases involving discrimination in salaries of teachers solely on account of race and color are of recent date only, and those called to the attention of the court, or which the court has found are: Mills v. Lowndes, D.C., 26 F.Supp. 792 decided March, 1939; Mills v. Board of Education, D.C., 30 F.Supp. 245, decided November 22, 1939; McDaniel v. Board of Instruction, D.C., 39 F.Supp. 638, decided July 3, 1941; Thomas v. Hibbitts et al., D.C., 46 F.Supp. 368, decided, 1942; Turner v. Keefe, D.C., 50 F.Supp. 647, decided April 16, 1943.

In each and all of these cases except the last, Turner v. Keefe, there was either a definite schedule of salaries, not according to names but according to positions, expressly fixed by statute or resolution of the school board for the teachers in the white schools and those in the colored schools, and the salaries for colored teachers holding similar positions were substantially lower than the salaries for white teachers. The sole classification in the schedule was according to race, except in the case of Mills v. Board of Education, there was a minimum salary schedule, and the plaintiff in that case a principal was paid less than the minimum provided by the legal schedule for white teachers; with the further showing of a custom or usage to fix the salaries of colored teachers lower than white, admittedly on account of race and color.

After ruling there was discrimination in that case, the court said [30 F.Supp. 251]:

"* * * I wish to make it plain, however, that the court is not determining what particular amounts of salaries must be paid in Anne Arundel County either to white or colored teachers individually; nor is the Board in any way to be prohibited by the injunction in this case from exercising its judgment as to the respective amounts to be paid to individual teachers based on their individual qualifications, capacities and abilities, but is only enjoined from discrimination in salaries on account of race or color.

"* * * It does not follow that because the positions are equivalent the particular persons filling them are necessarily equal in all respects in professional attainments and efficiency; and some range of discretion in determining actual salaries for particular teachers is entirely permissible to the County Board of Education. * * * But the Board has full discretion in its judgment to pay more than the minimum to any white or colored teacher who merits it, provided the discrimination is not solely on account of race and color."

In the case of Turner v. Keefe et al., 50 F.Supp. 647, 651, the learned District Judge said:

"College degrees conferred upon one and years of teaching experience do not of themselves qualify one for the profession of teaching or of supervising of teaching and do not constitute the sole criteria for admeasurement of teacher worth. In addition to said factors, the ability to impart knowledge to pupils, as well as one's own temperament, patience, instructional skill and performance, disciplinary ability, physical health, personality and character, interest in work, dependability and scholarship, attitude, tolerance, habits and other factors may also be considered and judged. * * *

"It is no doubt true that many of the ratings lack scientific accuracy, inasmuch as several of the factors or qualities set forth in the rating sheet are subjective in their nature, which may have resulted in individual inequalities in the salaries paid. However, the evidence fails to indicate that such inequalities, as may exist are disproportionately numerous among the group or class comprised of negro teachers and principals, nor does the evidence warrant a specific finding that any teacher is being paid less compensation than that to which she is legally entitled."

█ Taking into consideration all of the competent evidence in the case, and giving to it the weight to which the court thinks it is entitled under all of the facts and circumstances shown by the evidence, the court finds that the plaintiff has failed to sustain the burden placed upon her to establish the existence and maintenance of a policy, custom and usage to pay colored teachers and principals less than white teachers and principals, and thereby discriminate against them solely on account of race and color.

█ This disposes of the two questions of fact involved in this cause and leaves the constitutional question raised by the issues. It is the policy of the courts not to undertake to decide a constitutional

question, a question of the constitutionality of a State action unless no alternative to the adjudication is open to the court. Having disposed of the two questions of fact involved herein, the court will not pass upon the constitutional question, as it is not deemed essential to a final disposition of the case. See Railroad Commission of Texas v. Pullman Company, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971.

The sole remaining matter to be disposed of is the question of taxation of the costs. The plaintiff having failed to sustain her contention by meeting the burden cast upon her by law, the costs of this action will be taxed against the plaintiff.

Proposed findings of fact, conclusions of law and praecipe for judgment may be prepared by counsel for defendants, copies furnished to counsel for plaintiff, and submitted to the court for consideration and entering.