**Naomi BROOKS et al., Appellants,**

v.

**SCHOOL DISTRICT OF CITY OF MO-
BERLY, MISSOURI, etc., et al.,
Appellees.**

**No. 16131.**

United States Court of Appeals
Eighth Circuit.
June 17, 1959.

734

Robert L. Carter, New York City
(Herbert O. Reid, Washington, D. C., R.

L. Witherspoon, Sidney R. Redmond, St. Louis, Mo., and Lee V. Swinton, Kansas City, Mo., on the brief), for appellants.

Arthur M. O'Keefe, Moberly, Mo. (Austin Walden, Moberly, Mo., on the brief), for appellees.

Before SANBORN, VAN OOSTERHOUT and MATTHES, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

Plaintiffs, seven Negro school teachers, who were employed by the defendant School District to teach in its segregated school maintained for Negroes during the 1954–1955 school year, and were not reemployed when the school system was integrated commencing in the fall of 1955, appeal from final order entered October 2, 1958, dismissing their complaint praying for declaratory judgment, an injunction, and damages.

Plaintiffs' cause of action is based upon their claim that the defendants denied them reemployment after integration solely because of their race or color, pursuant to a rule, practice, or custom of the Board of Education not to employ Negro teachers. Plaintiffs allege that such practice, policy, custom, or usage is in violation of their rights under the Constitution and laws of the United States, particularly the Equal Protection Clause of the Fourteenth Amendment, and 42 U.S.C.A. §§ 1981, 1982, and 1983.

There is no dispute between the parties as to the applicability of the Fourteenth Amendment. The defendants admit that any rule, practice, or custom denying plaintiffs reemployment because of race or color would be discriminatory and in violation of plaintiffs' constitutional rights.

The trial court properly determined it had jurisdiction to consider the alleged violation of plaintiffs' rights protected by the Constitution and laws of the United States.

Prior to integration the Board operated six white elementary schools, a white junior high school, a white junior college, and a combined elementary and high school for Negro students known as the Lincoln School. During the school year 1954–1955, the Board employed 109 teachers. Ninety-eight white teachers served in the white schools. Eleven Negro teachers taught in the Lincoln School. Plaintiffs are seven of the eleven teachers employed in the Lincoln School.

The defendant Board, immediately after the decision of the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, commenced the necessary study looking toward the integration of its schools. After seeking the views of all races, an acceptable plan of integration was worked out and was placed in effect at the opening of the fall term of 1955. It is stipulated that, "the Board of Education of Moberly, Missouri, fairly and honestly and expeditiously went about and conducted the integration of the colored pupils and the white pupils in the Moberly School System prior to the filing of this suit." Because of this stipulation it is unnecessary to set out the detailed evidence pertaining to the development of the integration plans. It should be said, however, that the original proposal contemplated the use of the Lincoln School as a unit of the integrated system, but this plan was abandoned when substantial objections thereto were made by both races. The Negroes opposed the retention of Lincoln as a voluntary segregated school, and no effort was made to retain the segregated school. The integration plan finally adopted called for the closing of the Lincoln School, and provided that pupils of all races would attend the integrated school in the district in which they lived.

As predicted by the Integration Committee, the plan adopted required fewer teachers than were needed under the former system. The Board's determination that the teaching staff could be reduced by eleven teachers is unchallenged. At a Board meeting held on April 13, 1955, the Board decided not to renew the contracts of the eleven Negro teachers, and took similar action as to four white teachers. The teachers not employed were given statutory notice to that effect.

The Negro teachers, prior to integration, were employed by the School District which operated all of the Moberly schools. The Board, in its consideration of employment of teachers for the school year 1955–1956, attached no significance to the fact that Lincoln School was closed, and did not decline reemployment to the Negro teachers upon the basis that the teaching positions which they had previously filled no longer existed. Instead, the Board endeavored to compare the qualifications of all teachers of both races in reaching its determination as to which teachers should be reemployed.

All witnesses offered on behalf of the Board denied that the Board had any rule, practice, or custom to refuse employment to Negro teachers because of their race, and also denied that plaintiffs were in any way discriminated against because of their race. The Board's position is that, at the April meeting and at all subsequent meetings at which vacancies were filled, the plaintiffs were given full and fair consideration for all teaching positions which they were certificated to fill; and the Board maintains that in each instance the teachers employed were better qualified than any of the plaintiffs to fill the teaching positions available.

Among the stipulations of the parties are the following:

"For the purpose of this case, it is stipulated that the rule of the Board of Education of the Moberly School District which was in force at the time of integration, with respect to the basis upon which the Superintendent should recommend the employment of teachers to the Board, and under which the Board should employ the teachers, was a proper rule and was fair and just, said rule being as follows:

" 'All applications for employment in Moberly public schools must be in writing, and submitted to the Superintendent's office. All persons to be employed shall be recommended by the Superintendent and appointed by the Board of Education. Recommendations for appointment shall be made on the basis of merit, determined by Superintendent from the applicant's qualifications, training, experience, *personality and ability to fulfill the requirements of the position*. All employees must be physically fit to serve efficiently. Teachers are to file a health certificate with the Superintendent before assuming their duties.'

"(5) For the purpose of this case, it is stipulated that it was the duty of the Board of Education of the Moberly School District to employ in said district the teachers who, in their judgment, best complied with the rules relating to the employment of teachers hereinbefore referred to, and it is further duty of the Superintendent to make his recommendations to the Board on the same basis." [Emphasis ours.]

The emphasized portion of the rule just quoted covers the intangible elements to be considered in connection with the employment of the teachers. It is the application of this part of the rule that caused the difficulty in this case.

It is conceded that some of the Negro teachers had a greater number of college credits than some of the white teachers, and it is likewise true that some of the plaintiffs had more years of experience in teaching than some of the white teachers who were employed.

There is ample expert testimony to the effect that the intangibles included in the Board's rule are important elements to be considered in determining teacher qualifications. This court recognized the importance of intangibles in Morris v. Williams, 8 Cir., 149 F.2d 703, where we held that intangibles may properly be considered in fixing teachers' salaries, and that differentials in salaries based upon valid intangibles are not violative of the Fourteenth Amendment. We stated (p. 708):

" * * * Teaching is an art; and while skill in its practice can not

be acquired without knowledge and experience, excellence does not depend upon these two factors alone. The processes of education involve leadership, and the success of the teacher depends not alone upon college degrees and length of service but also upon aptitude and the ability to excite interest and to arouse enthusiasm. * * * "

As heretofore stated, the plaintiffs stipulated as to the validity of the rule. Their real complaint is that it was not honestly and fairly applied.

We shall briefly state the facts relative to the method used by the Board in employing teachers for the school year commencing in the fall of 1955.

On April 11, 1955, Superintendent Henderson wrote each Board member a letter advising that the teaching staff should be reduced by eleven members. He set out in detail the training and experience of all the teachers, Negro and white, who were serving in the system. At a Board meeting on April 13, 1955, the qualifications of all the teachers of both races were discussed in the light of all of the elements of the Board's rule, including the intangibles. The Superintendent, upon the basis of the qualifications, recommended the teachers to be reemployed. The eleven Negro teachers were not included in the group thus recommended. The Board at the same meeting also decided not to renew the contracts of four white teachers.

Superintendent Henderson testified at length at the trial, comparing the qualifications of the teachers reemployed with the Negro teachers on the basis of the whole rule of the Board. His testimony was corroborated as to elementary teachers by Mr. Brown who was supervisor of elementary teachers. Board members Wallace and Chamier testified that all teachers in the system were fairly considered for the positions available which they were qualified to teach; that the Board's whole rule, including intangibles, was considered in determining the qualifications; and that the Board, after a fair consideration of all the information

before it, reemployed the teachers who in its judgment were best qualified. It is stipulated that the testimony of the remaining members of the Board if called would be similar to that of Mr. Chamier. All of the defendants' witnesses denied that race was considered in the selection of the teachers. There is no direct evidence of any race prejudice or discrimination on the part of any Board member or school official. The only thing bordering on direct evidence as to discrimination is the statement of Mrs. Tymony, one of the Negro teachers, to the effect that Superintendent Henderson told her that the time would come when teachers would be employed on the basis of qualifications only; and a statement by another teacher, Mrs. Harris, that Supervisor Brown told her no colored teachers would be employed in Moberly for at least five years. Mr. Henderson denied making the statement attributed to him by Mrs. Tymony, and Mr. Brown denied making the statement above set out to Mrs. Harris. This conflict in testimony raised the question of credibility of witnesses for the trial court. In any event it is doubtful whether these isolated statements are substantial evidence of discrimination. The Board was the body that did the hiring.

The trial court in its unreported memorandum opinion held that no racial discrimination was established, and that the Board had fairly applied its rule in determining the teachers to be employed. The court states in part:

"The testimony indicates that at this meeting the training, experience, personality and ability to fulfill the requirements of the position, including various intangibles, were discussed, and the testimony indicates that the Board's decision was based on its rule with respect to the employment of teachers. There is no testimony that there was any effort to get rid of the Negro teachers, either as individuals or as a group, because of race or color. The Board determined after a full and fair consideration of the matter that the

white teachers in the system were better qualified than the Negro teachers and none of the Negro teachers were re-employed.

\* \* \* \* \*

" \* \* \* The individual qualifications, capabilities and abilities of each teacher must be considered, and human capabilities cannot be reduced to a mathematical formula. Intangible factors, such as personality, character, disposition, industry, adaptability, vitally affect the work of any teacher. The Superintendent's recommendation as to the various teachers was based upon information he obtained, his own observations, and observations of the principal and other teachers in responsible positions in the district. There was not the slightest inference in the testimony of these men that the race or color of any teacher entered into his recommendations. The court cannot substitute its judgment for that of the School Board or the Superintendent on the wisdom or expediency of a determination within the Board's jurisdiction, but must rather determine if there exists sufficient factual basis that the Superintendent and Board's actions were arbitrary and discriminatory with respect to the Negro teachers.

\* \* \* \* \* \*

"The Superintendent in his testimony dealt specifically with each of the plaintiffs, comparing them with the teachers who were hired, and gave in detail his analysis on each.
\* \* \*

\* \* \* \* \* \*

"One's hindsight is often better than one's foresight, and while it does not enter into the decision in this matter, it is worthy of note that after the pupils in the system were integrated it was found that virtually without exception for the first half of the year 1955–56, the Negro pupils had trouble keeping up in their classes, but that during the second half of the year they were able to do so. It was the opinion of the Superintendent that this was due to the fact that they were not as well grounded in fundamentals as the white pupils with whom they were in classes. This fact supports the analysis of the plaintiffs by the Superintendent. \* \* \*

\* \* \* \* \* \*

"Under the testimony, the facts and circumstances shown in the evidence, the court finds that the plaintiffs have failed to sustain the burden placed upon them, and this applies equally to each plaintiff, that the defendants had a practice, policy, rule or regulation of not hiring duly qualified applicants of the Negro race to teach in the public schools, but the testimony on the other hand shows that the Negro teachers were given the same consideration as the white applicants in the hiring of teachers. There is no evidence or circumstance which indicates there was any discrimination by the defendants based solely on account of race or color."

The notice served upon the plaintiffs to the effect that their contracts would not be renewed was the notice contemplated by Section 163.090, V.A.M.S. Such statute reads in part:

" \* \* \* It shall be the duty of each and every board having one or more teachers under contract to notify each and every such teacher in writing concerning his or her re-employment or lack thereof on or before the fifteenth day of April of the year in which the contract then in force expires. \* \* \* "

In interpreting this statute, the Supreme Court of Missouri in Bergmann v. Board of Education, 360 Mo. 644, 230 S.W.2d 714, holds that the statute does not change the legal effect of the teacher's contract, and does not "establish some sort of tenure." The court holds that the teacher's contract expires according to its terms, and that the notice contemplated by the statute can not be consid-

ered a discharge. Among other things the court states (230 S.W.2d at page 720):

> " * * * Notice under the statute that the teacher will not be re-employed for the succeeding year can not, therefore, be construed as a discharge or dismissal from employment, since the only written contract of employment is in no wise affected by the notice. * * *
>
> " * * * On the admitted facts, plaintiffs Koerner and Prost had no contractual, preferential or statutory rights to continued employment. No contractual or statutory relationships were terminated by the notices. The existing contracts of employment were carried into effect, they were duly executed in all respects by the respective parties and they expired by lapse of time. There were no discharges, dismissals or termination of the employment of Koerner and Prost 'for unlawful reasons,' or in violation of constitutional rights, because there were no dismissals, discharges or terminations of employment by the defendants. * * *"

■ In the case we are considering, the employment contracts of the plaintiffs expired at the end of the 1954–1955 school year. Under Missouri law plaintiffs had no tenure rights. Plaintiffs' rights and obligations under their previously-existing contracts expired upon the termination of the contracts by lapse of time. A teacher upon expiration of his contract has neither contractual nor statutory rights to continued employment.

■ School boards are vested with wide discretion in matters affecting school management, including the employment of teachers, and a court may not interfere with the board's action unless the board has exercised its power in an unreasonable, arbitrary, capricious, or unlawful manner. State ex rel. Wood v. Board of Education, 357 Mo. 147, 206 S.W.2d 566; Morris v. Williams, D.C.

E.D.Ark., 59 F.Supp. 508, 510; 78 C.J.S. Schools and School Districts § 128, pages 920–923.

Plaintiffs' theory is that the Board could not possibly have come up with the result of refusing reemployment to the eleven Negro teachers honestly and in good faith upon the basis that in each instance a white teacher had superior qualifications for a position to which the Negro teacher was eligible, and that an inference must be drawn from such result that the Board in its decision was influenced by discriminatory racial considerations.

We concede that the result is unusual and somewhat startling. In the usual situation, considering the number of applicants involved, one would suppose that a fair application of standards would result in the reemployment of some of the Negro teachers. However, we cannot say with certainty here that there was no substantial evidence to support the trial court's finding and conclusion that the Board acted honestly pursuant to its rule in awarding the teacher contracts.

■ This case was tried to the court without a jury. We are required to give great weight to witness credibility determinations by the trial court. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S. C.A.; United States v. Oregon State Medical Society, 343 U.S. 326, 329, 72 S.Ct. 690, 96 L.Ed. 978. In the case last cited the Court states (343 U.S. at page 339, 72 S.Ct. at page 698):

> " 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746. * * *"

■ In order to justify reversal in our present case we would have to determine that the trial court was not warranted in believing the positive testimony of Superintendent Henderson and the Board members to the effect that all

applicants for teaching contracts were fully and fairly considered, pursuant to the Board's rule, and that no racial consideration entered into the matter of employment of teachers. Of course, the trial court was not compelled to believe this testimony, even though it was not directly disputed. On the other hand, the court, if convinced as to its truth, was not compelled to discredit it. The trial court had an opportunity to observe the witnesses as they testified and is in a far better position to determine questions of credibility of witnesses than this court upon the cold record. The trial court also had the opportunity to observe five of the plaintiffs on the witness stand and form some judgment with reference to the validity of the defendants' testimony with respect to the qualifications of such teachers.

We find no positive evidence that the Board was influenced by racial considerations in the matter of employing its teachers. Additionally, there are a number of factors tending to negative any racial prejudice on the part of the Board. The integration was completed promptly and in a manner satisfactory to all concerned. The wishes of the Negroes as to integration were fully considered and observed. Before integration the Negroes were paid salaries equal to those of the white teachers, and the Negro school was furnished with the same type of equipment and supplies as the white schools.

Each case of this type must be decided upon the basis of its own peculiar facts. We have carefully examined the entire record and find a mass of testimony tending to support the Board's determination that the white applicants' qualifications were superior to those of the Negro teachers with reference to the positions the Negro teachers were certificated to fill. The only evidence to the contrary on the qualifications issue was testimony by some of the Negro teachers in which they make some effort to compare their qualifications with those of the competing white teachers. In most instances the witnesses by their own testimony show that they were not familiar with the facts bearing upon the teaching skills of the competing teachers.

Our examination of the record satisfies us that there is substantial evidence to support the Board's determination as to teacher qualifications. The record discloses that experts in the field of education are not in agreement as to the best methods of evaluating teachers. Possibly, better methods might be available for evaluating teacher qualifications. The Board has a wide discretion in performing its duties, including those relating to the employment of teachers. If the Board acted honestly and fairly in the exercise of its discretionary powers, the plaintiffs are in no position to complain at least so long as the action of the Board is not unreasonable, arbitrary, or motivated by racial consideration.

Plaintiffs claim that they at least should have had preferred consideration for the three vacancies they were qualified to fill which arose by reason of the Board's refusal to reemploy four white teachers at the April 13 Board meeting. The Board's action declining to renew the contracts of the four white teachers took place at the same meeting that similar action was taken as to plaintiffs. The Board has a wide discretion as to the procedure to be followed in considering the renewal of contracts. The record shows that plaintiffs' applications were given full and fair consideration as to all vacancies which occurred on the teaching staff, which they were qualified to fill.

It is our conclusion that there is substantial evidence to support the trial court's determination that the plaintiffs have failed to meet the burden of proving that the Board's action in failing to renew their teaching contracts resulted from racial discrimination.

Affirmed.