Grace CHAMBERS, Doris Yvonne Greene, Mary Ann White, and the North Carolina Teachers Association, a corporation, Plaintiffs,

v.

The **HENDERSONVILLE CITY BOARD OF EDUCATION**, a public body corporate, Defendant.

Civ. No. 2388.

United States District Court
W. D. North Carolina,
Asheville Division.

Sept. 30, 1965.

———◆———

Conrad O. Pearson, Durham, N. C., Jack Greenberg, Derrick A. Bell, Jr., and Melvyn Zarr, New York City, J. LeVonne Chambers, Charlotte, N. C., Ruben J. Dailey and Robert L. Harrell, Asheville, N. C., Eddie Tucker, Jackson, Miss., and LeMarquis DeJarmon, Durham, N. C., for plaintiffs.

Arthur B. Shepherd, L. B. Prince, and Jonathan W. Jackson, Hendersonville, N. C., for defendant.

CRAVEN, Chief Judge.

This is a class action brought by three Negro teachers and the North Carolina

Teachers Association [1] against the Hendersonville City Board of Education. The teachers and the Association seek to invoke the equitable jurisdiction of the court, and allege that the School Board has denied reemployment as teachers to the individual plaintiffs and other Negro teachers, because of their being members of the Negro race, in violation of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States.

Plaintiffs seek an injunction restraining the School Board from refusing to consider reemployment of individual plaintiffs and other Negro teachers and professional school personnel for the 1965–66 school year and subsequent school years because of race. Plaintiffs further seek an injunction to prevent the maintenance of a bi-racial system of hiring, assigning, reemploying and dismissing plaintiffs and other teachers and to affirmatively require the School Board to initiate a plan of unitary, non-racial future employment, reemployment and assignment.

A preliminary injunction was not sought, but, instead, plaintiffs prayed the court to advance the cause on the docket.

The complaint was filed on June 28, 1965. Because of the alleged constitutional basis of the litigation and the importance of the matter to the teachers and the School Board, the case was given special consideration by the court, and counsel were requested to complete discovery procedures and pleadings so that it could be finally heard at the earliest possible date. The case was tried on August 18 and 19, 1965, at Asheville, North Carolina.[2]

Thereafter, on my own motion, a rehearing was ordered for September 22, 1965, at which time both sides offered additional evidence and the record was supplemented.

Counsel for the teachers and the Teachers Association stated to the court in oral argument that the controversy is largely one of the proper inferences to be drawn from substantially undisputed subsidiary facts. Even so, it is thought desirable to find the facts in some detail.

Until September 1964 the defendant operated a completely segregated school system consisting of four schools. Three of these, namely Bruce Drysdale, Rose Edwards and Hendersonville High School, were exclusively for white pupils and had an exclusively white faculty. Ninth Avenue School, covering grades one through twelve, was exclusively for Negro students of the Hendersonville district and, in addition, accommodated migratory Negro pupils coming from Henderson, Transylvania and Polk Counties. It was staffed entirely by Negro teachers.

For the school year 1964–65 the Board adopted a freedom of choice plan of desegregation. The four schools continued to be operated much as they had been before.

For the school year 1965–66 the Board abandoned its freedom of choice plan and completely integrated all pupils into its four school buildings, with Bruce Drysdale accommodating grades one through three, Rose Edwards four through five, Junior High (formerly Ninth Avenue) six through eight, and Hendersonville High nine through twelve. All pupils—regardless of race— are now attending the appropriate school.

The Board has discontinued its former practice of accepting Negro students who reside outside of the district in Henderson County and the neighboring counties of Polk and Transylvania. These Negro pupils have been returned to their respective and appropriate school districts and will not attend school in

1. The membership of this Association is largely, if not entirely, Negro. Among its purposes are the promotion of education generally and the improvement of the status of teachers.

2. Buford v. Morganton City Board of Education, D.C.W.D.N.C.1965, 244 F.Supp. 437, a very similar case, was tried on the same days, but the cases were not consolidated.

the Hendersonville system. As a result, the number of students to be taught in the Hendersonville system for 1965–66 is diminished approximately 217 as compared with the prior year. The Negro pupil enrollment for the school year 1964–65 was 498, and for the year 1965–66 is 281. Likewise, the number of teacher jobs in the Hendersonville system has diminished by five.[3] What was formerly Ninth Avenue School has become Hendersonville Junior High School —attended by all eligible pupils without regard to race.

Former Ninth Avenue School has been abolished. The nature, purpose, scope, racial composition, and even the name have been changed. Last year twenty-four Negro teachers taught in the Ninth Avenue School and none in the other three schools. This year eight[4] Negro teachers will teach in all of the schools in the system.

■■ Why are sixteen fewer Negro teachers employed this year than last? The three Negro plaintiffs and the Teachers Association insist that the answer is obvious: racial discrimination. Although an oversimplification, it is not unfair to suggest that plaintiffs' case rests almost entirely upon this one ultimate fact: twenty-four Negro teachers one year and eight the next.[5]

Plaintiffs' argument comes to this: that it is *impossible* that sixteen out of twenty-four Negro applicants (two-thirds) should be found inferior to white applicants with respect to qualifications for teaching. The argument is a novel one. It has no support in law,[6] nor, as far as I know, in human experience.

The decimation of Negro teachers is not inexplicable. Until the current school year 1965–66 Negro teacher applicants did not compete with white teacher applicants. With respect to teachers, there was a tight compartmentation of the schools. Nor does failure to reemploy these sixteen teachers mean that the Board decided that *every* white teacher had qualifications superior to these applicants. This is so because teachers compete against each other only in their respective classifications. For example, an English teacher does not compete against a music teacher, but only against other English teachers; an elementary teacher does not compete against high school teachers.

■ The plaintiffs have the burden of proof (persuasion) to satisfy the court from the evidence and by its greater weight that the Negro teachers or one or more of them failed reemployment by reason of his race.[7]

■ The startling decimation of Negro teachers—twenty-four one year and eight the next—became less startling as the evidence was presented. A group

3. The Hendersonville school system offers to an unusual degree what has come to be called in North Carolina "quality education". The system is one of relatively few public systems accredited by the Southern Association of Schools and Colleges. Actually, the sharp decline in pupil enrollment would have diminished teacher jobs more than indicated but for the willingness of Hendersonville people to pay for more teachers than allotted by the State. The state teacher allotment for 1965–66 is 66; the number of teachers employed is 101.

4. The Board hired eight. Since the first hearing, one has resigned and accepted employment elsewhere.

5. *Query:* does such a decimation of Negro teachers, sixteen out of twenty-four, standing alone, even make out a *prima facie* case? Does not an affirmative answer to this question necessarily rest on the unsupported premise that teachers are fungible? Since the School Board assumed the burden (risk) of going forward with evidence to fully explain its failure to employ the sixteen teachers, the question has become academic. And, in any event, in trial without jury a federal court must find the facts and cannot simply dismiss for failure to make out a case. Federal Rules of Civil Procedure 41(b), 52.

6. Brooks v. School District of City of Moberly, Missouri, 267 F.2d 733 (8th Cir. 1959), is a clear holding that it is not impossible that *all* of a group of eleven Negro teachers may be found inferior with respect to teaching qualifications to competing white teachers.

7. Id. at 740.

of six out of the class of sixteen for whom the suit is brought were not reemployed for perfectly plain and objective reasons having nothing whatsoever to do with race or even with their general qualifications for teaching. Teacher Cunningham simply retired. Teacher Roberts did not wish to teach in an integrated school, preferring to teach only members of her own race, and declined to be considered for reemployment.[8] Teacher Young's bricklaying class (the only subject he taught in the prior year) was discontinued, and his job simply abolished. Teacher Weight,[9] a woman, was fifty-six years old, 5 feet 5½ inches in height, and weighed 219 pounds. Her excessive weight for her height was considered medically disabling by the Superintendent, who refused her reemployment. Teacher Habit [10] was refused reemployment because of "objectionable personal habits". The School Board was ready and willing to disclose the nature of those habits to the court. The court declined to permit disclosure without the consent of the teacher concerned. Counsel for plaintiffs stated to the court that they were without authority to consent to the introduction of testimony which might be embarrassing or even damaging to the individual teacher concerned. Teacher Medic [11] failed of reemployment because her own personal physician, who happened also to be a member of the School Board, stated to the Board that she should not be employed. The School Board asserted that the failure to reemploy was for a medical reason and that the Board and the doctor concerned stood ready and willing to disclose the reason to the court. Counsel for the plaintiffs were without authority to waive the patient-doctor privilege of this particular teacher, and the court declined to permit the evidence to be received without her consent.

For the foregoing reasons, the class allegedly discriminated against is reduced to ten. Five of these—teachers Robinson, Wigfall, White, Work and D. Greene—may be considered together. All five taught in the Ninth Avenue School for Negroes last year. That school was largely run by an advisory board consisting of Negro leaders in the community. Although concerned, of course, with quality education for pupils, the advisory board was apparently equally concerned with providing employment opportunities for Negro teachers. As a result of this dual policy, teachers were employed at the Ninth Avenue School according to a lower scale of qualifications than prevailed elsewhere in the system. The NTE scores for these five teachers varied from a low of 403 to a high of 439. The minimum standard adopted by the Superintendent and the Board of Education for teachers employed on the basis of an NTE score is 450.[12] No white teacher employed in the school system on the basis of NTE scores has a score lower than 450. Four of these five teachers had *probationary*

8. Also, her NTE score was 423, and the Superintendent and Board uniformly required not less than 450 for *all* teachers having NTE scores. (The adoption of the policy of using NTE scores does not invalidate pre-existing certificates, and there are no NTE scores for some teachers—both Negro and white.) "NTE" means National Teacher Examination, a nationally recognized test of teacher competency administered by the Education Testing Service, Princeton, New Jersey. Effective July 1, 1964, the North Carolina State Board of Education adopted the policy that all teachers applying for a new, upgraded, or changed certificate must meet minimum score requirements, e.g., to get an "A" certificate a minimum score of 450 is required.

9. This is not, of course, her name. Pseudonyms will be used where necessary to avoid embarrassment or damage to professional reputation. Identification is well established in the record.

10. A pseudonym. See footnote 9.

11. A pseudonym. See footnote 9.

12. This is the minimum prescribed by the State Board of Education for an "A" certificate. See footnote 8.

certificates.[13] The Superintendent and the Board have adopted a policy to assure continued accreditation by the Southern Conference of Schools and Colleges that no teacher—white or Negro—will be employed on the basis of a probationary certificate. These five teachers, by objective standards, simply do not meet the minimum qualifications for employment in the reorganized school system. Where an objective standard [14] is applied to all teachers without regard to race, there can be no inference of racial discrimination.

The original class of sixteen allegedly discriminated against by reason of race is, thus, now reduced to five. To determine whether these five have suffered invidious discrimination requires some analysis of their qualifications and a comparison with other teachers with whom they competed for positions.

### MRS. E. D. PET [15]

### MRS. G. W. CHAM [16]

Mrs. Pet testified at the trial. She demonstrated a neat and attractive appearance. She has an AB degree from Johnson C. Smith University, Charlotte, North Carolina, and is certified to teach French and English and has seven years experience. No NTE score is available for her. Mrs. G. W. Cham is a graduate of Livingstone College with an AB degree and is certified to teach English and French and has sixteen years experience. Her NTE score is 522. These teachers were considered by the Superintendent in competition with Dale Lappin, who is a graduate of the University of Indiana at Marion, Indiana, and is certified to teach art and French and who has had seven years experience. Mr. Lappin's NTE score is 672.

Mrs. Pet was rated "about average" and was not recommended [17] for reemployment by her principal, Mr. L. H. Anderson.[18] Mrs. Cham was rated "average" by the same principal, Mr. L. H. Anderson, who noted that she had little control of pupils, but spoke favorably of her in other respects.

Aside from the intangibles, which do not appear to be weighted in favor of the Negro teachers, it appears objectively that Mr. Lappin's NTE score of 672 is unusually high and could alone account for the decision of the Superintendent to employ him. Last year three French teachers were employed, and this year only one such teacher is employed in the entire system.[19]

13. Teachers Robinson, White, Work and D. Greene. Although Miss Wigfall had an A certificate, her NTE score was 429—lower than the 450 prescribed minimum.

14. There are four exceptions to the application of these minimal standards in the school system. These exceptions are persons employed to train non-educable but trainable pupils. With respect to these exceptions, the Superintendent testified that temperament and compassion for handicapped children (IQ under 50) to whom knowledge could not be imparted was of primary importance and that certification to teach a subject was of no consequence for the simple reason that subjects are not taught to such non-educable children. Such children are simply trained in caring for themselves physically. Most teachers do not want employment to train non-educable children. The record does not disclose whether plaintiffs or members of their class would have accepted such employment.

15. A pseudonym. See footnote 9.

16. A pseudonym. See footnote 9.

17. Mr. Anderson's written report to the Superintendent contained, with respect to Mrs. Pet, the following: "Not dependable—takes too much for granted; seems to have problems; does not control and direct pupils properly."

18. Mr. Anderson is a Negro.

19. It is not clear from the record whether Mrs. Pet and Mrs. Cham were considered for positions to teach English for which they also had certificates. Assuming they were not, there is no evidence specifically showing the reason for such failure. But the fact that they were carefully considered for the French position, plus the appraisal of their own principal, negates an inference that race was the reason.

## CLAUDE HOST [20]

Mr. Host competed for positions as eighth grade teacher with six other teachers. Four of the others had NTE scores of 500 or over. Mr. Host had no available NTE score, but neither did two other teachers who were employed. No objective differences appear in certification or in degrees earned that are significant. But Mr. Host was rated below average, i. e., "needs help", and was not recommended for reemployment by his principal, Mr. Anderson.[21] The other teachers were so recommended.

## MRS. FOWL [22]

Mrs. Fowl competed for position as a second grade teacher with six others who were employed. All seven in this group had similar degrees earned and all had the equivalent of A teaching certificates, except that Mrs. Fowl's was a graduate certificate. Objective factors do not reveal any reason for her failure to be reemployed. But the report of her principal, Mr. Anderson, to the Superintendent rates her simply as "average".[23] The other teachers were more favorably recommended by their respective principals.

## MRS. LOREE G. JACKSON

Mrs. Jackson competed against three other teachers who were employed for three positions teaching high school science. All four teachers had similar earned degrees. Mrs. Jackson's was from Shaw University, and the others were University of North Carolina, Clemson, and Western North Carolina. All were certified to teach high school science, having the equivalent of A certificates or better. One of the teachers employed was qualified to teach driver training in addition to high school science, and another one was qualified to act as track coach in addition to teaching high school science and had an NTE score of 559. The third teacher employed had an NTE score of 513. No such score is available for Mrs. Jackson. However, she was recommended by her principal, Mr. Anderson, as a very good teacher.[24] Obviously there is no objective reason upon which her failure to be reemployed can be predicated. The School Board made no effort to show that she was other than a very good and competent teacher. The Superintendent simply testified, in substance, that in his opinion the other three who were employed were even better qualified than was Mrs. Jackson.

By way of summary, four out of these five teachers were rated by their own Negro principal to be average or below average teachers. The evidence shows that all of the employed competing white teachers were appraised by their respective principals or by the Superintendent as being much better than average. The School Board and the Superintendent have satisfactorily explained, almost beyond argument it seems to me, their failure to employ at least fifteen out of the sixteen members of the class. Mrs. Loree G. Jackson is apparently an excellent teacher. If it were my responsibility to weigh her qualifications against those of the competing teachers, I might consider her to be as well, or even better, qualified than they. But

20. A pseudonym. See footnote 9.

21. Anderson's report to the Superintendent contained the following: "Classroom atmosphere is always poor. Teacher doesn't seem to have any control of pupils. Students are not motivated. They pay little or no attention to the teacher * * * no discipline."

22. A pseudonym. See footnote 9.

23. Anderson's report contained the following: "Tone: fair. Atmosphere sort of cool. Complains a little too much about small things * * * could give pupils more of an opportunity to think—she leads them too much. A desk type teacher. Sits all the time." (There were other comments of a favorable nature.)

24. Anderson's report to the Superintendent showed that she works well with pupils, is very cooperative, that her lessons are meaningful, and that she shows a very good use of audio-visual material.

that responsibility is not mine. I have been exposed to the problem of appraising teachers only a few days. The Superintendent has been exposed to it most of his adult life. No court ought to substitute its own notion with respect to such a matter for the informed professional opinion of a school superintendent so long as it appears he has formed that opinion in good faith.

"School boards are vested with wide discretion in matters affecting school management, including the employment of teachers, and a court may not interfere with the board's action unless the board has exercised its power in an unreasonable, arbitrary, capricious, or unlawful manner." Brooks v. School District of City of Moberly, Missouri, 267 F.2d 733, 739 (8th Cir. 1959). "(E)xperts in the field of education are not in agreement as to the best methods of evaluating teachers. Possibly, better methods might be available for evaluating teacher qualifications. The Board has a wide discretion in performing its duties, including those relating to the employment of teachers. If the Board acted honestly and fairly in the exercise of its discretionary powers, the plaintiffs are in no position to complain at least so long as the action of the Board is not unreasonable, arbitrary, or motivated by racial consideration." Id. at 740. "The court cannot substitute its judgment for that of the School Board or the Superintendent on the wisdom or expediency of a determination within the Board's jurisdiction, but must rather determine if there exists sufficient factual basis that the Superintendent and Board's actions were arbitrary and discriminatory with respect to the Negro teachers." Id. at 738.

It is well to remember that the burden of proof (persuasion) is not upon the School Board. It rests, instead, upon plaintiffs and members of their class. It has not been sustained. The evidence in this case does not support the proposition that plaintiffs and members of their class were wrongfully displaced and refused employment because of their race. The Board has not, for the school year 1965–66, maintained a bi-racial system of hiring, assigning, and reemploying or failing to reemploy teachers, nor is there any evidence of any intention to maintain such an unconstitutional system in the future.

This case is a weaker one from plaintiffs' viewpoint than was Brooks v. School District of City of Moberly, Missouri, supra. In Brooks there was some *direct* evidence of racial discrimination. In this case there is none. In Brooks several of the Negro teachers had a greater number of college credits than competing white teachers. There is only one instance of such disparity here.[25] In Brooks apparently *all* of the Negro teachers were well qualified by objective standards in comparison with white teachers. The analysis of NTE scores shows it is not so here. In Brooks the school board hired *none* of the Negro teachers who were formerly employed, whereas in this case the Board hired *one-third* of those formerly employed. Even so, in Brooks the evidence was held insufficient to establish racial discrimination.

Since the only question presented[26] is the failure to reemploy teachers and that has been decided, an appropriate judgment will be entered dismissing the complaint.

---

25. Mrs. Fowl has an Elementary G certificate, as compared with A certificates of competing teachers, but she was not recommended by her principal.

26. The complaint is broad enough to be construed as an attack upon the plan of desegregation with respect to pupils. Since the Board has effected complete integration of all facilities since this suit

was filed, the attack upon the plan of desegregation has become moot. With respect to questions that may arise in implementation of the plan, jurisdiction has been retained in Rhonda K. Williams v. The Hendersonville City School Board, Civil Action No. 2182, W.D.N.C., so that no purpose would be served by retaining jurisdiction in this suit.