6 So.2d 22

**GULLEDGE et al. v. MITCHELL.**

5 Div. 352.

Supreme Court of Alabama.

Jan. 15, 1942.

Rehearing Denied Feb. 19, 1942.

Gerald & Gerald and Reynolds & Reynolds, all of Clanton, for appellants.

Grover C. Walker, of Clanton, and Hill, Hill, Whiting & Rives, of Montgomery, for appellee.

FOSTER, Justice.

The only question in this case is one of fact, and that is whether J. H. Gulledge in his lifetime delivered the deeds in question to the grantee, the appellee here, Miss May Mitchell.

The deeds were found after his death in his personal depository. He had signed and acknowledged them before the clerk of the court from whom he procured an envelope. When the papers were found, the deeds were in a smaller envelope, addressed to appellee and stamped, sealed and wrapped with a sheet of paper with a legend on it in his handwriting, as follows: "Please mail this letter and say nothing to my folks. My last request. J. H. Gulledge." That envelope so wrapped and containing the deeds was in another addressed to the clerk, with the words on it, "open in private." That package was

then in the envelope which he had obtained from the clerk, which was addressed to the clerk.

■ There was much evidence of a purpose to give appellee this land, and a desire to marry her, but he was dissuaded on account of his physical condition. However, a purpose to do so is not sufficient even though the deeds may be signed and acknowledged. There must have been a delivery sufficient to meet the requirements of the law. Alford v. Henderson, 237 Ala. 27, 185 So. 368; Culver v. Carroll, 175 Ala. 469, 57 So. 767, Ann.Cas.1914D, 103; Dawson v. J. A. Lindsey & Co., 223 Ala. 169, 134 So. 662.

■ The question here is not whether certain facts constitute a delivery, actual or constructive, but whether the grantor in fact placed the deeds in the hands of the grantee with the intent to deliver them to her. There is no other sort of delivery which the grantee claims occurred. Since the deeds were found among the grantor's papers after his death, the burden is upon her to prove such delivery. Mr. Gulledge acknowledged the deeds before the clerk who signed the certificate of acknowledgment, and then he carried them off on December 15, 1938. He died March 12, 1939.

The grantee did not testify, presumably in recognition of the rule that she was incompetent as a witness to any transaction she may have had with the deceased grantor. But she was rooming in Montgomery in a house of Mrs. Green, who testified that Mr. Gulledge came to her house about ten days before Christmas 1938, and with appellee came into her kitchen where she was engaged and asked her to witness a delivery of the deeds to appellee. She identified the deeds as those here in question. She afterwards saw the deeds in possession of appellee. And on one occasion when the sister of the witness was present, appellee got them out and had them read over to her and remarked, "I will give them to Uncle Joe and let him keep them some place for me." By "Uncle Joe," she probably meant J. H. Gulledge. Mr. Gulledge told several witnesses that he had given appellee some land, and to one that he had delivered her the deeds and intended for her to have all the land he had in Chilton County not connected with the business he was engaged in at Verbena, and apart from what he had inherited along with his brothers and sisters.

Mr. Gulledge died on Sunday. On the next Monday, appellee went to the aforementioned clerk of the Circuit Court at Clanton, ten miles from Verbena, and he said upon examination:

"She told me that she was Mr. Joel Gulledge's ward, and that he had made some provision for her, I think is what she said, and that there were some papers that was in among his effects at Verbena, and that he had told her that if anything happened to him for her to come immediately to me and tell me to go to the office and ask for the papers that were addressed to me—papers or package, or something like that—and she wanted me to go that day, and I told her I hated to go before Mr. Gulledge was buried, and let me wait until after he was buried. So I did wait until after the funeral, and I think it was Wednesday morning—he was buried on Tuesday, I believe, after he died on Sunday night. I think it was Wednesday morning I went and asked Mr. Will Gulledge if he had found anything in Mr. Joel's effects —a package, I believe I said—addressed to me. He said he had not, but he hadn't gone through all the things yet, and if he found anything he would let me know; and I went back, may be the next day, or soon after that, anyway, and asked him about it again, and he said he still hadn't found anything, but he hadn't made a very careful search yet; and I don't remember whether that was—whether I went back the third time, or whether he found them right after that time; but, anyhow, I went by at the time just before he found the package—I went by there in the late afternoon, and early the next morning he came to my house, Mr. Will Gulledge came to my house, and told me he had found the papers, and if I would come by the office he would give it to me. I went down there and he handed it out to me, and it was the same envelope that I had given him—given to Mr. Joel Gulledge in my office, or one just like it, and it was addressed to me and sealed. Will Gulledge suggested that I open— * * *.

"Well, I opened the first envelope, that is, the outer one, and inside was another smaller envelope, sealed, and addressed to me, and on that was written 'Open in private'. I opened that. And there was another envelope inside of that. That was addressed to Miss May Mitchell, Montgomery, Alabama, and had a three cent stamp on it, and it was sealed, and

it had a sheet of regular letter size paper folded around it and stuck together with mucilage where it lapped over, and on that paper was written 'Please mail this letter and say nothing to my folks. My last request. J. H. Gulledge.' * * *

"Miss Mitchell had asked me, when she was up here, to call her the very minute I got the papers, or the package, whatever it was. So I came on up here and called her over the telephone and told her that the instructions on the papers were to mail to her, it was addressed to her, and the instruction in there was to mail it to her; and she said 'Just hold it until I get there. I'm coming right on.' So in an hour—well, about an hour and a half, I guess, Mrs. Green came in the office and said Miss Mitchell was out in the car, parked by the side of the courthouse here. I went out there and handed the envelope to her, and she started—or she wanted to open it, I believe. I told her my instruction was to mail it, and I wanted to carry that out for—".

There are some circumstances which militate against her claim. They are as follows: After she had been to the clerk at Clanton on Monday, she went to Verbena and saw Mr. W. A. Gulledge, a brother of deceased, at the undertakers, and had a conversation with him which he related as follows: [She]"told me that she was glad to meet me; that Joel had frequently told her that he wanted her to know me; that I was a good fellow. And she made some expression of being disturbed over her future financial affairs; and I asked her if Joel had made any provision for her future support, and she told me none that she knew of. And that—I told her, then, that if Joel had placed his affairs in my hands, as I had tried to get him to do, or had made some will, that we would have—I would have carried it out, according to his instructions." And on that same Monday morning before appellee left Montgomery to go to Clanton, the wife of C. E. Gulledge, a brother of J. H. Gulledge, went by to see appellee where she resided, and she was sobbing and saying, " 'Oh, what will become of me?' Says, 'What am I going to do?' And just to kind of console her, I says, 'May, don't cry. I just feel sure they will take care of you.' I said, 'I know they will.' " And a few days later she and her husband went by to see appellee, and the following was the evidence of Mrs. Gulledge as to that visit: "Yes.

We went, and she was back in her room, and we sat in the living room, and she came up, and we talked quite casually, and Charlie just asked the question, says, 'May, did Joel leave you any papers, or anything'? She said 'No, not a thing.' "

Appellee did not testify in the case, and did not deny or explain those statements. But that which she made to Mr. W. A. Gulledge was just after she left the clerk, in which she told him about the papers and what they were and where he would find them. Whatever may be the explanation, she undoubtedly knew of the existence of the papers and that the clerk was the one to look after them. They existed as she told him. She is bound to have known of their existence, and how and where they were kept.

There is also a contention that the time of day when Mr. Gulledge visited the clerk in Clanton and acknowledged the deeds conflicts with the evidence of Mrs. Green as to the time of the same day when she says he delivered the deeds to Miss Mitchell in her kitchen. But the clerk says he is not certain as to the exact time. He has no memorandum of the hour, but merely declares what is his recollection, and that is not clear in his own mind. Also the records of Dr. Watkins show that he was in his office for treatment that day, but the hour is not shown. We would not discount the testimony of Mrs. Green on account of such uncertain evidence. He could have been in the clerk's office earlier that day, and then have gone to see Dr. Watkins in Montgomery, and on that trip have delivered the deeds as Mrs. Green testified. Clanton is only about one and a half hours from Montgomery by automobile, as he usually traveled.

■ The evidence of the delivery of the deeds was clear, precise and plausible, and pursuant to his wishes often expressed and conforming to his own declarations afterwards made to Dr. Strock. This evidence of Dr. Strock was not privileged even though it related to professional communications (Dyer v. State, 241 Ala. 679, 4 So.2d 311 [4]), but the declarations were not made during his professional relations with Mr. Gulledge.

■ The fact that Mr. Gulledge was proceeding to rent the land in 1939, and to make repairs on the place does not conflict with a delivery of the deeds. They are very inconclusive circumstances in that respect.

Mr. Gulledge was a widower of something like sixty-seven years of age. His wife had died the previous year, and he became devoted to appellee and looked after her needs, but the doctors said he had a serious heart ailment: one advised him that to marry her would be distinctly dangerous, the other advised him to do so even though he kept it secret from the family. Some members of the family seemed to be on familiar and friendly relations with her, while others had no acquaintance.

Undoubtedly he intended to give her this land, and undoubtedly he did everything necessary to do so, unless it be a delivery of the deeds to her. He was a business man of large experience and probably knew the necessity of a delivery. Knowing that, he probably would have made delivery if he intended for her to have the land. All admit such an intention.

The witnesses as to the controverted issue were examined orally in open court before the judge who rendered the decree. He found that the deeds were duly delivered. We think his finding was amply supported both as to the delivery of the deeds and as to the prayer for reformation so as to correct the description of some of the land.

Affirmed.

GARDNER, C. J., and THOMAS and BROWN, JJ., concur.