Arthur Baglis **BUFORD**, J. L. Coley, B. H. Sanders, Mrs. Louise Bell Hudgens, Miss Williene L. Barber, Mrs. Annie H. Penn, Mrs. Marian Bailey LeGrand, Haywood Homesley, Jr., Roy McCullough, and the North Carolina Teachers Association, a Corporation, Plaintiffs,

v.

The **MORGANTON CITY BOARD OF EDUCATION**, a Public Body Corporate, Defendant.

Civ. No. 523.

United States District Court
W. D. North Carolina,
Statesville Division.

Aug. 23, 1965.

Conrad O. Pearson, Durham, N. C., Jack Greenberg, Derrick A. Bell, Jr., and Melvyn Zarr, New York City, J. LeVonne Chambers, Charlotte, N. C., and Ruben J. Dailey and Robert L. Harrell, Asheville, N. C., Eddie Tucker, Jackson, Miss., and Le Marquis De Jarmon, Durham, N. C., for plaintiffs.

Thomas M. Starnes and Sam J. Ervin, III, Morganton, N. C., for defendant.

CRAVEN, Chief Judge.

This is a civil action brought by nine Negro teachers and the North Carolina Teachers Association [1] against the Morganton City Board of Education. The teachers and the Association seek to invoke the equitable jurisdiction of the court and allege that the School Board has denied reemployment as teachers to the individual plaintiffs and other Negro teachers, because of their being members of the Negro race, in violation of the due

1. The membership of this association is largely, if not entirely, Negro. Among its purposes are the promotion of educa- tion generally and the improvement of the status of teachers—especially members of the Association.

process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States.

Plaintiffs seek an injunction restraining the School Board from dismissing individual plaintiffs and other Negro teachers and professional school personnel and refusing to consider reemployment of individual plaintiffs for the 1965–66 school year and subsequent school years because of racial considerations. Plaintiffs further seek an injunction to prevent the maintenance of a bi-racial system of hiring, assigning, reemploying and dismissing plaintiffs and other teachers, and to affirmatively require the School Board to initiate a plan of unitary, non-racial future employment, reemployment and assignment.

A preliminary injunction was not sought, but, instead, plaintiffs prayed the court to advance the cause on the docket.

The complaint was filed on June 17, 1965. Because of the alleged constitutional basis of the litigation and the importance of the matter to the teachers and the School Board, the case was given special consideration by the court, and counsel were requested to complete discovery procedures and pleadings so that it could be finally heard at the earliest possible date and before the beginning of the next school year. Counsel cooperated fully, with the result that the case was tried on August 18 and 19, 1965, at Asheville, North Carolina.

Liberally construed, the complaint originally questioned the sufficiency of the School Board's overall plan of compliance with the constitutional requirements enunciated in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180 (1954), and subsequent cases with respect to assignment of pupils and general operation of the system. At the beginning of the trial the case was narrowed considerably by stipulation of counsel for the teachers and Teachers Association to the effect that the court might properly construe the complaint as seeking only to attack the conduct of the School Board with respect to reemployment and assignment of teachers. Counsel disclaimed those portions of the complaint which might be held to require the court to pass upon the sufficiency of the School Board's overall Plan for Desegregation.

Counsel for plaintiffs offered at the trial five witnesses. Examined as their first witness was Superintendent Maston S. Parham of the Morganton City Schools. Thereafter, three of the plaintiffs (Mr. McCullough, Mrs. Hudgens and Mr. Buford) were briefly examined. To wind up their case, plaintiffs offered Mr. Elliott B. Palmer, Executive Secretary of the North Carolina Teachers Association, as a witness.

The defendant School Board offered no testimony.

Counsel for the teachers and the Teachers Association stated to the court in oral argument that the controversy is largely one of the proper inferences to be drawn from substantially undisputed subsidiary facts. Even so, it is thought necessary to find the facts in some detail.

From the evidence offered by plaintiffs, I find the facts to be as follows:

The School Board began some years ago to formulate plans and take steps in the direction of desegregation of the Morganton City Schools. The first steps taken were with respect to assignment of pupils. Progressive changes were made culminating in the current plan of desegregation which is now under consideration by HEW.[2] The current plan of desegregation may be summarized as follows:

Pupils in grades one through six inclusive were accorded com-

2. Counsel agreed in open court that the Secretary of Health, Education and Welfare might properly proceed to pass upon the sufficiency of said plan's compliance with the 1964 Civil Rights Act without regard to the pendency of this case, and consented that this court not undertake to do so.

plete freedom of choice in the selection of school to be attended.

Pupils in grades seven and eight were likewise accorded the same freedom of choice.

All pupils, regardless of ethnic origin, in the ninth grade were assigned to West Concord School (previously known as Olive Hill High School).

All students, regardless of ethnic origin, in grades ten, eleven and twelve were assigned to attend the Morganton High School.

For many years, ending in the school year 1964–65, the old Olive Hill School was a segregated school attended solely by persons of the Negro race. It not only served the Negro children of Morganton, but, also, by arrangement with other school systems, served Negro students who did not reside within the Morganton school district. Under the current plan of desegregation, these other Negro pupils are returned to their respective and appropriate school districts and will not attend school in the Morganton system. As a result of the discontinuance of this migratory practice, the number of students to be taught in the Morganton system for 1965–66 is diminished approximately 225 as compared with the prior year. Likewise, the number of teacher jobs in the Morganton system has diminished by eight. Last year fourteen Negro teachers at Olive Hill taught in all grades—nine through twelve— an exclusively Negro student body. For the next school year the plan of the School Board is that ten teachers (one Negro and nine white) will teach the ninth grade *only* at what was formerly Olive Hill School. The racial complexion of the ninth grade will be one hundred and eighty-three white and thirty-five Negro. For the

year 1964–65, the School Board employed twenty-six Negro teachers whose teaching was confined to two "Negro" schools, i. e., Olive Hill and Mountain View Elementary.[3] For the school year 1965–66 the School Board proposes to employ twelve Negro teachers, ten of whom will teach at Mountain View Elementary School, one at the Morganton High School, and one at Olive Hill (West Concord School).

Olive Hill has for all practical purposes been abolished. The nature, purpose, scope, racial composition, and even the name have been changed. The court judicially notices that graduation ceremonies were held in June 1965 celebrating, with mixed emotions, the end of an era and the end of the Olive Hill School.

Why are fourteen fewer Negro teachers employed this year than last? The Negro teachers and the Teachers Association insist that the answer is obvious: racial discrimination. Although an oversimplification, it is not unfair to suggest that plaintiffs' case rests almost entirely upon this one startling ultimate fact: twenty-six Negro teachers one year and twelve the next.

But the decimation of Negro teachers is not inexplicable. Until the current school year 1965–66, Negro teacher applicants did not compete with white teacher applicants. With respect to teachers, there was a tight compartmentation of the schools.

Plaintiffs' argument comes to this: that it is *impossible* that fourteen out of twenty-six Negro applicants should be found inferior to white applicants with respect to qualifications for teaching. The argument is a novel one—analogous to the *res ipsa loquitur* rule of evidence. It

---

3. Olive Hill had no white pupils last year. Mountain View had no white pupils last year. For 1965–66 Mountain View will be mostly Negro with eight white students.

has no support in law, nor, so far as I know, in human experience.

But failure to employ so many Negro teachers, under certain circumstances, may make subject to careful scrutiny the Board's determination. According to Superintendent Parham, four Negro teachers were discharged for sufficient reasons having nothing to do with race; two did not apply for re-employment; one was an interim teacher; and there was no allotment made by the State for the position occupied by another. That leaves seven. Failure to reemploy these seven does not mean that the Board decided that *every* white teacher had qualifications superior to these applicants. This is so because teachers compete against each other only in their respective classifications. For example, an English teacher does not compete against a music teacher but only against other English teachers. An elementary teacher does not compete against high school teachers.

■ Under our adversary system of justice, plaintiffs have the burden of proof to satisfy the court from the evidence and by its greater weight that a particular teacher failed reemployment by reason of his race. The evidence of this sort offered by plaintiffs relates to nine Negro teachers who were not reemployed:

### WILLIENE L. BARBER

Miss Barber taught commercial subjects, i. e., general business and typing, at Olive Hill during the year 1964–65. A Miss Sherrill and a Mr. Case taught similar subjects the same year. Miss Sherrill retired and Mr. Case resigned. The failure to reemploy Miss Barber results in none of the three persons employed to teach these subjects in 1964 being employed to teach these subjects in 1965–66. These three teachers are replaced by Mrs. Teeter, Miss Martin and

Mr. Clodfelter. Miss Martin has B.S. and S.A.[4] degrees, business experience at Burlington Industries, and was offered a graduate fellowship at the University of North Carolina at Greensboro. Mrs. Teeter had two years business experience, and Mr. Clodfelter considerable part-time business experience plus an ability to teach in another field, i. e., vocational guidance. All of the applicants had the same A certificate except for Mr. Clodfelter's additional qualification in vocational guidance. Miss Barber had six years teaching experience, whereas the other applicants had none.

### ARTHUR B. BUFORD

Mr. Buford was first employed in the Morganton system in 1962, has an A.B. degree and teaching experience of twenty-five years. He has an A certificate qualifying him to teach English and French. Approximately ten teachers of English are employed for 1965–66. Mr. Buford has not taught French, although his certificate entitles him to do so. The evidence does not disclose the qualifications of the competing applicants to teach English except that all of them have at least equivalent college degrees and equivalent A certificates. Experience of the other applicants varies from one to twenty-five years.

### J. L. COLEY

Mr. Coley taught agricultural courses at Olive Hill last year. Because rural students were eliminated from the Morganton city system, no such courses will be offered in the Morganton City Schools during the year 1965–66. Mr. Coley's job has thus been abolished.

### HAYWOOD HOMESLEY, JR.

Mr. Homesley is certified to teach social studies. He has an A certificate, one year of experience and an A.B. degree. Because of the change in the school system, one less teacher in the field of social studies is needed for 1965–66 as compared with the prior year. All of the competing applicants in the social studies field are

4. An S.A. is a Bachelor of Science degree in secretarial administration peculiar to the University of North Carolina at Greensboro.

certified and active in other subjects and areas—except for one who is in charge of the high school annual. Mr. Homesley comes closer to competing with Mr. Lackey than with perhaps any other applicant. Mr. Lackey had no prior teaching experience. But Mr. Lackey will also act as baseball coach. Homesley is not qualified to coach baseball.

### LOUISE B. HUDGENS

Louise B. Hudgens has a B.S. degree and twenty-six years teaching experience in the field of home economics. She has an A certificate in home economics. There were two jobs in 1964 as teachers of home economics, and likewise two in 1965. A Mrs. Hester and Miss Hart were employed and the Board failed to reemploy Mrs. Hudgens. Neither of those employed had previously taught in the Morganton system. Mrs. Hester has both a B.S. and M.A. degree and two years experience. Miss Hart has no previous experience and holds the same degree (B.S.) as does Mrs. Hudgens. Mrs. Hudgens is not yet reemployed in any school system.

### ROY McCULLOUGH, JR.

Last year there were three positions as band directors and instrumentalist teachers and this year there are two such positions. Mr. McCullough, therefore, found himself competing for his job against Mr. Babelay and Mr. Graeber. Mr. Babelay has a graduate degree in addition to a college degree and has fourteen years experience as compared with Mr. McCullough's eight years of experience. Mr. Graeber's certificate and educational qualification are similar to Mr. McCullough's. He has had two years teaching experience. Mr. Graeber has taught children of elementary and junior high school age, whereas Mr. McCullough has not taught in these age groups. The decision was to keep Mr. Graeber and Mr. Babelay where they were and not reemploy Mr. McCullough. Before that decision was made final, however, the Superintendent undertook to assess the interest in a choral music program for the ninth grade with disappointing results. Mr. McCullough is competent to teach choral groups and, according to the Superintendent, would have been employed in that capacity and used perhaps also as a part-time English teacher had there been sufficient interest in such a program.

### ANNIE H. PENN

Mrs. Penn has been employed in the Morganton system since 1962, has an A.B. degree and a total of five years teaching experience. She has a secondary A certificate in social studies and library science. Her paper qualifications do not appear to exceed any of those who were employed. She was not recommended by her principal for remployment on the ground that she had some difficulty in controlling pupils.

### B. H. SANDERS

Mr. Sanders has a B.S. degree and six years teaching experience and a secondary A certificate in the fields of agriculture, general science and biology. Last year at Olive Hill he was engaged in a team teaching experiment which has been discontinued and for which there are no funds for the year 1965–66. He was not recommended by his principal for reemployment on the ground of weakness in maintenance of discipline.

### MARIAN B. LeGRAND

Mrs. LeGrand has a B.S. degree, one year of teaching experience and a secondary A certificate in home economics, chemistry and general science. In 1964 she was hired as an interim teacher in biology only, and her certificate has expired. She was employed last year only to fill in temporarily for a teacher who became pregnant.

According to plaintiffs, the foregoing are the teachers who were displaced wrongfully by the School Board. Certain other Negro teachers were mentioned very briefly in the evidence. A Mr. Hooker was not reemployed because he was insubordinate and incompetent. Decision as to reemployment of a Mr. Johnson was deferred because he failed to pass a national teachers test, and he ac-

442

cepted a job elsewhere before a decision was made. Decision as to the employment of a Miss Templeton was deferred and in the interim she took a job in Lee County. According to the Superintendent, if she were still an applicant in her particular specialty she would probably be employed. A Mr. Carson did not apply for reemployment.

It is perhaps worth mentioning certain other Negro teachers who *were* employed. Mr. Snipe was employed as a principal and was chosen in preference to two other applicants, both of whom were white. Also, a Miss Helen Barber and a Miss Ann Douglas, both Negroes, were employed for the first time in the Morganton system for 1965–66. The displaced Negroes were not qualified for the positions filled by Miss Barber and Miss Douglas.

Mr. Elliott B. Palmer, Executive Secretary of the North Carolina Teachers Association, testified as an expert witness with respect to the operation of public school systems. He stated his own opinion to be that it is simply impossible to completely and accurately evaluate the qualifications of teachers. This accords with my own experience. We do not yet have a yardstick by which to measure human beings. Mr. Palmer's opinion with respect to teacher employment is also adopted by the court: that the most important characteristic of a teacher is classroom performance, followed by educational qualifications (degrees) and by the attitude and personality of the teacher. Except for earned degrees and experience data, these criteria are intangibles.

Mr. Palmer also testified tending to show, and the court adopts his testimony, in these aspects: that there is no seniority or tenure for teachers under the North Carolina educational system. Teachers in North Carolina are employed on a year-to-year basis, and all teachers must reapply in April of each year for employment the following school year.

 Counsel for the teachers and the Teachers Association stated in oral argument that it is impossible to probe the minds of the members of the School Board to determine their motivation in making decisions with respect to reemployment. If this be true, then it seems to me that plaintiffs cannot prevail. Under North Carolina law, no person—Negro or white—has the right to be reemployed as a teacher in the Morganton school district. The School Board may decline to reemploy a teacher for any reason or even for no reason at all— *provided only* that employment may not be denied for a reason prohibited by law or the Constitution. See Parker v. Board of Education of Prince George's County, Maryland, 237 F.Supp. 222 (D.C.Md. 1965). Unless the evidence establishes that failure to reemploy was *because of race*—regardless of what else it may establish—the plaintiffs have failed to prove their case. There is not one scintilla of direct evidence of wrongful purpose in the failure to reemploy any of the plaintiffs or members of their class. The facts found with respect to J. L. Coley, Annie H. Penn, B. H. Sanders, and Mrs. Marian B. LeGrand speak for themselves. With respect to these applicants, there is not the slightest suggestion that the failure to reemploy was based upon the racial factor. With respect to the other five, the court must attempt what Mr. Palmer considered impossible: evaluation of teacher qualifications. These applicants have a paper record (degrees earned and certificates granted) equivalent to those persons who were employed. In most instances, however, if not all, the degrees earned were from institutions which are not comparable as to quality with the institutions wherein the white applicants were educated. The evidence is not entirely clear upon this aspect of the case, but the court may judicially notice that civil rights advocates have successfully urged that Negro educational institutions have not in the past been of the same quality as white educational institutions. Except for Mrs. Hudgens and Mr. Buford, and perhaps Miss Barber, a comparison of prior teaching experience as between applicants employed and those who were not employed does not indicate that the displaced teachers had markedly greater experience.

By way of summary, therefore, no indication of wrongful motivation can be predicated upon the records of education and experience—unless it be with respect to Mrs. Hudgens, Mr. McCullough and Miss Barber. There can be no substitute for experience in any endeavor. But neither is there a substitute for knowledge, temperament, personality and the intangibles of heart and mind we call leadership.

The testimony tends to show, especially that of Mr. Palmer, that in the evaluation of teacher applicants experience on the part of the school superintendent or person charged with the responsibility to recommend employment is of special importance. It is conceded that Mr. Parham is a school administrator of great experience. He testified that without exception he recommended to the School Board those persons whom he thought to be best qualified for the particular teaching position without regard to race. Despite the weighted experience in favor of Mr. McCullough and Mrs. Hudgens and Miss Barber, I am unable to conclude that Mr. Parham's employment recommendation and the decision of the Board was determined by race of the applicants, and I fail and refuse to do so.

In the final analysis, employment of teachers involves appraisal of intangibles which cannot be reduced to a slide rule formula. My decision is not to assert that Mr. Parham and the School Board succeeded in hiring the best qualified applicants, but merely to decide that the evidence in this case does not support the proposition that plaintiffs and members of their class were wrongfully displaced and refused employment because of their membership in the Negro race.

I further find as a fact that the Superintendent and the School Board carefully, and in good faith, considered reemployment of the individual plaintiffs and others of their class for the 1965–66 school year and did not refuse to consider such persons because of their race. I find as a fact that the School Board for the school year 1965–66 has not and is not maintaining a bi-racial system of hiring, assigning and reemploying or failing to reemploy teachers.

In Brooks v. School District of City of Moberly, Missouri, 267 F.2d 733 (8th Cir. 1959), the United States District Court for the Eastern District of Missouri was faced with a school teacher case remarkably similar to this one. Eleven Negro school teachers who were employed by the school district during the 1954–55 school year were not reemployed for the year following. The teachers made the identical claim put forward here that they were denied reemployment solely because of their race or color. The district court held that the Negro teachers had failed to sustain their burden of proof that action of the School Board in failing to renew their teaching contracts resulted from racial discrimination. Much of what was said by the Court of Appeals for the Eighth Circuit in affirming the decision of the district court is pertinent:

> "It is conceded that some of the Negro teachers had a greater number of college credits than some of the white teachers, and it is likewise true that some of the plaintiffs had more years of experience in teaching than some of the white teachers who were employed."

> "This court recognized the importance of intangibles in Morris v. Williams, 8 Cir., 149 F.2d 703 * *."

> " ' * * * Teaching is an art; and while skill in its practice can not (sic) be acquired without knowledge and experience, excellence does not depend upon these two factors alone. The processes of education involve leadership, and the success of the teacher depends not alone upon college degrees and length of service but also upon aptitude and the ability to excite interest and to arouse enthusiasm. * * * ' "

The court thereafter also quoted with approval from the decision of the district judge as follows:

> " ' * * * The individual qualifications, capabilities and abilities of each teacher must be considered, and

human capabilities cannot be reduced to a mathematical formula. Intangible factors, such as personality, character, disposition, industry, adaptability, vitally affect the work of any teacher. The Superintendent's recommendation as to the various teachers was based upon information he obtained, his own observations, and observations of the principal and other teachers in responsible positions in the district. There was not the slightest inference in the testimony of these men that the race or color of any teacher entered into his recommendations. The court cannot substitute its judgment for that of the School Board or the Superintendent on the wisdom or expediency of a determination within the Board's jurisdiction, but must rather determine if there exists sufficient factual basis that the Superintendent and Board's actions were arbitrary and discriminatory with respect to the Negro teachers.'"

"School boards are vested with wide discretion in matters affecting school management, including the employment of teachers, and a court may not interfere with the board's action unless the board has exercised its power in an unreasonable, arbitrary, capricious, or unlawful manner." Id. at 739.

Precisely as in the instant case, in Brooks the plaintiffs' theory was that the Board could not possibly have come up with the result of refusing reemployment to the Negro teachers honestly and in good faith upon the basis that in each instance a white teacher had superior qualifications for the position to which the teacher was eligible, and that an inference must be drawn from such result that the Board in its decision was influenced by discriminatory racial considerations. What the Eighth Circuit said in response to this contention is precise-

ly what this court has concluded with respect to this case:

"We concede that the result is unusual and somewhat startling. In the usual situation, considering the number of applicants involved, one would suppose that a fair application of standards would result in the reemployment of *some* [5] of the Negro teachers. However, we cannot say with certainty here that there was no substantial evidence to support the trial court's finding and conclusion that the Board acted honestly pursuant to its rule in awarding the teacher contracts."

"The record discloses that experts in the field of education are not in agreement as to the best methods of evaluating teachers. Possibly, better methods might be available for evaluating teacher qualifications. The Board has a wide discretion in performing its duties, including those relating to the employment of teachers. If the Board acted honestly and fairly in the exercise of its discretionary powers, the plaintiffs are in no position to complain at least so long as the action of the Board is not unreasonable, arbitrary, or motivated by racial consideration." Brooks, supra at 740.

Franklin v. County School Board of Giles County, 242 F.Supp. 371, (D.C. Va. 1965), has been carefully examined. In that case, Judge Michie held that a school board had the duty to evaluate and compare Negro teachers whose jobs had been abolished by reason of the closing of a Negro school with all other teachers in the system and to consider such Negro teachers for employment in the entire system. The failure of the board to evaluate the qualifications of the Negro teachers for continued employment by comparison of their effectiveness with the other teachers in the system was held to be a discrimination against the Negro teachers. With that determination I am in complete accord. So, also, apparently, is the Morganton School Board. In this case all of the testimony tends to show

5. My italics.

that the Negro teachers in the Morganton system were carefully considered for jobs in the entire school system, which is exactly what Franklin v. County School Board of Giles County teaches.

Since Mrs. Hudgens, Mr. Buford, and Mrs. LeGrand remain unemployed at the time of the trial, this case has in no sense become moot. No one with a heart could fail to be sympathetic with a teacher of long experience and employment whose contract is not renewed and who is not reemployed. The other displaced teachers have accepted other employment, in some instances better apparently than that which has been lost.

The School Board questions the capacity of the Teachers Association to be joined as a party-plaintiff. It is adjudged that the Association is a proper, although not a necessary, party. See N. A. A. C. P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

Since the plaintiffs have consented to narrow the case to the question of failure to reemploy teachers, and that has been decided against them, an appropriate judgment will be entered dismissing the complaint.