Ilena Devone **DRAKE**, Plaintiff,

v.

**COVINGTON COUNTY BOARD OF EDUCATION et al., Defendants.**

**Civ. A. No. 4144–N.**

United States District Court,
M. D. Alabama, N. D.

Jan. 23, 1974.

OPINION

Before RIVES, Circuit Judge, and JOHNSON and VARNER, District Judges.

RIVES, Circuit Judge:

A teacher in the public schools of Alabama who has contracted and served in the same school system for three consecutive school years attains continuing service status, and has the right to be re-employed each succeeding school year[1] unless her contract is cancelled upon some ground provided in another section of the Alabama Code, which will be quoted later.

Plaintiff Drake, an elementary school teacher on continuing service status in the Covington County, Alabama, school system, seeks an injunction requiring the defendants to reinstate her to her former position as a school teacher in that system.

Drake received notice by letter dated April 27, 1973, that the Board of Education of Covington County proposed to cancel her employment contract for "immorality in that the Board has been presented with a physician's certificate stating that you became pregnant during the current school year at which time you were a single unmarried person." This letter informed Drake that she had a right under § 359 of Title 52 to request either a public or private hearing to contest the Board's action. Drake timely requested a private hearing.

A hearing was held before the Board of Education on May 22, 1973. Drake was represented by counsel and record of the proceedings was made. Although the Board's attorney offered the testimony of several witnesses concerning financial matters involving Drake, the Board properly refused to admit this evidence, and accepted testimony from a physician and from Drake herself. The doctor testified that tests indicated that Drake was pregnant. Drake admitted that she had engaged in sexual inter-

Solomon S. Seay, Jr., Montgomery, Ala. (Gray, Seay & Langford), Montgomery, Ala., for plaintiff.

Frank J. Tipler, Jr. (Tipler, Fuller & Barnes), Andalusia, Ala., for defendants.

---

1. Sections 351 and 352 of Title 52, Code of Alabama, 1940, Recompiled 1958.

course with her fiance in private on a number of occasions. Following a meeting of the Board in private session, the Chairman informed Drake that the Board had voted not to renew her contract.

Drake, through her attorney, pursued her statutory right to appeal to the Alabama State Tenure Commission.[2] A document dated June 13, 1973, indicates that the Commission met on that date to consider Drake's case. After oral argument and a review of the record, the Commission sustained the validity of the action of the Covington County Board of Education.

Under Alabama law, Drake could have sought review of the action of the State Tenure Commission by petition for mandamus filed in the Circuit Court of Covington County.[3] Instead, she filed a complaint in the United States District Court, alleging jurisdiction under 28 U. S.C. § 1331, 28 U.S.C. § 2201, and 28 U. S.C. § 1343 as authorized by 42 U.S.C. § 1983.

The Supreme Court has stated that "[i]t is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." Monroe v. Pape, 1961, 365 U.S.

167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492. Also see McNeese v. Board of Education, 1963, 373 U.S. 668, 671–676, 83 S.Ct. 1433, 10 L.Ed.2d 622. These cases indicate that Drake was entitled to choose a federal forum to litigate her constitutional claims.

The applicable section provides as follows:

"§ 358. *Grounds for cancellation of employment contract.*—Cancellation of an employment contract with a teacher on continuing service status may be made for incompetency, insubordination, neglect of duty, immorality, justifiable decrease in number of teaching positions, or other good and just cause; but cancellation may not be made for political or personal reasons."

Tit. 52, Code of Alabama, 1940, Recompiled 1958. Drake claims the immorality provision of this section, which provided the statutory basis for her dismissal, is void for vagueness. She attacks the constitutionality of the statute both on its face and as applied to her. Following the example of the Supreme Court in Pickering v. Board of Education, 1968, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, we consider first her challenge to the statute as applied. We then find it unnecessary to reach her challenge to the statute on its face.[4] We

2. See Title 52, § 360.

3. Title 52, § 361: "The action of the state tenure commission in reviewing transfers of teachers or cancellation of teacher contracts, if made in compliance with the provisions of this chapter, and unless unjust, shall be final and conclusive. Whether such action complies with the provisions of this chapter and whether such action is unjust, may be reviewed by petition for mandamus filed in the circuit court of the county where said school system is located."

4. In Pickering v. Board of Education, 1968, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, the appellant claimed that the Illinois statute permitting his dismissal on the facts of the case was unconstitutional as applied under the First and Fourteenth Amendments. Appellant also challenged the statutory standard on which the Board based his dismissal as vague and overbroad. The Supreme Court commented in a footnote that because of its disposition of the case, "we do not reach appellant's challenge to the statute on its face."

The Supreme Court provides no explanation in *Pickering* of its decision to consider, first, appellant's challenge to the statute as applied. Possibly a number of considerations influenced the Court. A finding of "unconstitutional as applied" is a narrower ground of decision than "facial unconstitutionality." It leaves the statute on the books, and allows the state a chance to attempt to apply the statute in a constitutional manner, and/or to secure a limiting construction from the highest state court. (The federal court is less free to construe state statutes.) See Coates v. City of Cincinnati, 1971, 402 U.S. 611 at 616–617, 91 S.Ct. 1686, 29 L.Ed.2d 214 (Black, J., sepa-

hold that the statute was applied in this case in a manner which violated Drake's constitutional right of privacy.

The details of the application of the statute to Drake were not clear at the time of oral argument. A stipulation filed by the parties in response to a request by the Court for further factual information revealed the manner whereby the defendants learned about Drake's claimed immorality:

"Defendant, Murray King, Covington County Superintendent of Education, would testify substantially that on, approximately, March 7, 1973, Mrs. Mary Gilmer, a bookkeeper for Covington County, told him she had heard a rumor that Miss Ilena Drake, an unmarried teacher in the Covington County School System, was a patient in Columbia General Hospital and was pregnant.

"The next day he called Dr. Evers, who runs that hospital, and asked him if it was true and Dr. Evers said it was. Dr. Evers told him that Miss Drake had asked him to do an abortion on her because she would lose her job if she had a baby. Dr. Evers said it had been confirmed by x-rays by two doctors and also the laboratory tests done by a laboratory technician.

"On Friday, March 9, 1973, at approximately 11:00 A.M., Mr. King, accompanied by Mr. Ovid Sanders, Transportation Superintendent for Covington County Schools, visited Miss Drake at her room in the hospital. At that time Mr. King informed Miss Drake that her condition was known and he would have to submit it to the Board of Education whether she did or did not have an abortion.

 \*     \*     \*     \*     \*     \*

"On Monday, March 12, 1973, Miss Drake called him at his office and said she had just been released from the hospital and that she was not pregnant at that time. On that day he (Mr. King) visited Dr. Evers at his office and Dr. Evers told him that he released Miss Drake on Saturday March 10, 1973, and she was still pregnant at that time.

"On Wednesday afternoon, March 21, 1973, Miss Drake visited my (Mr. King's) office. She informed me that she had been to two other doctors and they had told her she was not pregnant. I told her that if she would give me the name of a doctor who would say she was not that would be the end of it. She told me she had been advised not to give me the name of the doctor. *She had told me at that time also that Dr. Evers had told her she was two months pregnant and that her fiance had been gone for four months and she could not be less than four months pregnant.* [Emphasis supplied.]

"On one other occasion before March 27, 1973, I again talked with Miss Drake and again told her if she would furnish me the name of the doctor who would say she was not pregnant and he verified this, the matter would be dropped. She again refused to give me the name. Dr. Evers had also given me the certificate which was introduced in evidence at the hearing before the Board.[5]

"I reported all of the above to the Board of Education at their regular meeting on March 27, 1973, and as far as I know, the members of the Board had no other information concerning this at that time."

Following the clue indicated by the emphasized part of Mr. King's testimony, the attorney for the Board elicited

---

rate opinion) and 402 U.S. at 617ff, 91 S.Ct. 1686, 29 L.Ed.2d 214 (White, J., dissenting) for expressions of judicial reluctance to invalidate a statute on its face. Also, see Broadrick v. Oklahoma, 1973, 413 U.S. 601, especially at 615–16, 93 S.Ct. 2908, 37 L.Ed. 2d 830.

5. The doctor's certificate reads:
"TO WHOM IT MAY CONCER [sic]:
"This is to certify that Ilena Drake is pregnant as shown by a pregnancy test, and physical examination.
      "Signed     Ray Evers
             Ray Evers, M.D."

the following testimony on cross-examination of Drake.

"Q. Did you tell him [Mr. Murray King], in effect, that the doctor could not be correct, that you were two months pregnant because your fiance had been gone four months?

"A. Right.

"Q. Did you mean by that that you had been having relations with your fiance up until he left?

"A. I don't think that's . . . .

"MR. SEAY [Drake's attorney]: Answer the question.

"A. Okay. Yes, I'm twenty-eight years old, and I don't think the Board or anybody else can tell me what I can do with my private life.

"Q. Then you do acknowledge that you had sexual relations with this man while you were unmarried and while you were teaching here?

"A. Sure.

"Q. Will you tell us where those relations took place?

"A. Well, I have never been inside of a hotel.

"Q. Where do you recall different times that it took place?

"A. Mostly in his car.

"Q. Have you also had relations with any other man?

"A. No."

(Record pp. 18–19.)

■ The record and stipulation permit no other conclusion than that all of the evidence upon which the Board based its cancellation of Drake's employment contract had its source in disclosures from her own physician solicited by Superintendent King. The evidence fails to show that Drake consented for her doctor to disclose to the Board her private communications with him.[6]

In a closely related context, the Supreme Court has recently discussed the constitutional right of privacy:

"The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as Union Pacific R. Co. v. Botsford, 141 U.S. 250, 251, [11 S. Ct. 1000, 1001, 35 L.Ed. 734] (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution. In varying contexts, the Court or individual Justices have indeed found at least the roots of that right in the First Amendment, Stanley v. Georgia, 394 U.S. 557, 564, [89 S.Ct. 1243, 1247, 22 L.Ed.2d 542] (1969); in the Fourth and Fifth Amendments, Terry v. Ohio, 392 U.S. 1, 8–9, [88 S. Ct. 1868, 1872–1873, 20 L.Ed.2d 889] (1968), Katz v. United States, 389 U. S. 347, 350, [88 S.Ct. 507, 510, 19 L. Ed.2d 576] (1967), Boyd v. United States, 116 U.S. 616, [6 S.Ct. 524, 29 L.Ed. 746] (1886), see Olmstead v. United States, 277 U.S. 438, 478, [48 S.Ct. 564, 572, 72 L.Ed. 944] (1928) (Brandeis, J., dissenting); in the penumbras of the Bill of Rights, Griswold v. Connecticut, 381 U.S. [479], at 484–485, [85 S.Ct. 1678, 1681–1682, 14 L.Ed.2d 510]; in the Ninth Amendment, id., at 486, [85 S.Ct. at 1682, 14 L.Ed.2d 510] (Goldberg, J., concurring); or in the concept of liberty

6. On cross-examination of the doctor in the hearing before the Board, Drake's attorney made an unsuccessful attempt to show his part in reporting the pregnancy:

"Q. Did you report this pregnancy to the superintendent?

"MR. TIPLER: We object to that.

"THE CHAIRMAN: Objection sustained.
"MR. SEAY: May we have an exception?"

(Hearing Exhibit IV to Stipulation, p. 7.)

Drake's attorney may be excused from further attempts to explore the source of the report of her pregnancy.

In any event, the formal, technical rules of evidence in force in the ordinary judiciary system are not, generally speaking, applicable in administrative tribunals either federal or state. Gagnon v. Scarpelli, 1973, 411 U. S. 778, 786, 787, 789, 93 S.Ct. 1756, 36 L. Ed.2d 656; Wigmore on Evidence, 3rd ed. § 4a–§ 4c; Davis Administrative Law Treatise, Chapter 14.

guaranteed by the first section of the Fourteenth Amendment, see Meyer v. Nebraska, 262 U.S. 390, 399, [43 S.Ct. 625, 626, 67 L.Ed. 1042] (1923). These decisions make it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' Palko v. Connecticut, 302 U.S. 319, 325, [58 S.Ct. 149, 152, 82 L.Ed. 288] (1937), are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to marriage, Loving v. Virginia, 388 U.S. 1, 12, [87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010] (1967); procreation, Skinner v. Oklahoma, 316 U.S. 535, 541–542, [62 S.Ct. 1110, 1113–1114, 86 L.Ed. 1655] (1942), contraception, Eisenstadt v. Baird, 405 U.S. [438], 453–454, [92 S.Ct. 1029, 1038–1039, 31 L.Ed.2d 349] (1972); id., at 460, 463–465, [92 S.Ct. at 1042, 1043–1044] (White, J., concurring in result), family relationships, Prince v. Massachusetts, 321 U.S. 158, 166, [64 S.Ct. 438, 442, 88 L.Ed. 645] (1944), and child rearing and education, Pierce v. Society of Sisters, 268 U.S. 510, 535, [45 S.Ct. 571, 573, 69 L.Ed. 1070] (1925), Meyer v. Nebraska, *supra*.

"This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy."

Roe v. Wade, 1973, 410 U.S. 113, 152–153, 93 S.Ct. 705, 726, 35 L.Ed.2d 147.

The Court has also recently declined to restrict the right of privacy in sexual matters to married couples:

"If under *Griswold* [381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510] the distribution of contraceptives to married persons cannot be prohibited, a ban on distribution to unmarried persons would be equally impermissible. It is true that in *Griswold* the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."

Eisenstadt v. Baird, 1972, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349.

The Board made no finding that Drake's claimed immorality had affected her competency or fitness as a teacher, and no such nexus was developed in the evidence. No "compelling interest" as to the cancellation vel non of Drake's contract of employment was established by the evidence which would justify the invasion of Drake's constitutional right of privacy. Under the testimony that Drake was in the early months of pregnancy, she in consultation with her physician would be free to determine, without regulation by the State, whether pregnancy should be terminated. Roe v. Wade, *supra,* 410 U.S. at 163, 93 S.Ct. 705, 35 L.Ed.2d 147. For the State, in the absence of any compelling interest, to base cancellation of Drake's employment contract on evidence growing out of her consultations with her physician was, in our opinion, an unconstitutional invasion of her right of privacy. In this case the immorality provision of section 358 of Title 52, Code of Alabama was applied to Drake in a manner which invaded her constitutional right of privacy.

VARNER, J., dissents in accordance with opinion attached.

JOHNSON, Chief Judge (concurring).

I concur wholeheartedly with Judge Rives's opinion that the termination of the plaintiff under the circumstances of

this case violated plaintiff's constitutional right to privacy. While I have serious reservations as to the constitutionality of the immorality provisions of the statute by reason of the vagueness doctrine, I do not consider it appropriate in view of our conclusion that the application of the statute in this instance violated plaintiff's constitutional right to discuss that feature of the case. See Pickering v. Board of Education, 391 U. S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

I would, however, like to make several points to clarify my position in joining in the holding that the plaintiff's dismissal violated her constitutional right to privacy. As the majority opinion makes clear, this right—although not one of the specific guarantees of the bill of rights—stems directly from these guarantees of personal freedom that the framers felt were so essential to the preservation of ordered liberty.[1]

This constitutional right of privacy, which the plaintiff possessed and which was violated by the defendants in this case, is designed to create a zone of protected activities free from governmental intrusion. [This constitutional right of privacy is very different from the right of privacy sounding in tort to which the dissenting opinion refers in its discussion of Alabama law. This tortious privacy right, often spoken of as the Warren-Brandeis right of privacy,[2] is a creature of state law and is not constitutionally based. To the contrary, this right often comes in conflict with the First Amendment's guarantee of freedom of speech and of the press. See Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L. Ed.2d 456 (1967).

It appears that this confusion over the proper nature of the constitutional right to privacy is somewhat responsible for the dissent's conclusion that Miss Drake waived her right to privacy by answering questions about her sexual relations before the Covington County Board of Education. While it is true that an individual may lose his tortious right of privacy by openly and publicly discussing a particular matter,[3] courts indulge in every reasonable presumption against the waiver of constitutional rights. Fuentes v. Shevin, 407 U.S. 67, 94–95, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Moreover, for a waiver of a constitutional right to be effective, it must normally be "voluntary, knowing and intelligent." See Overmyer Co., Inc. v. Frick Co., 405 U.S. 174, 185–186, 92 S.Ct. 775, 31 L. Ed.2d 124 (1972); Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); Johnson v.

---

1. This right of privacy extends to several areas that I have been traditionally categorized as "immoral." For example, the Supreme Court of the United States has held that an unmarried woman—despite long-accepted notions of morality—may not be denied access to contraceptives. Eisenstadt v. Baird, 405 U.S. 438, 453, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

Abortion is another activity that has long been thought to contradict our society's accepted notions of morality. Yet, in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed. 2d 147 (1973), the Supreme Court rejected the contention that common conceptions of morality could justify a ban on abortion. Moreover, the court held that a woman's right to an abortion—based on her constitutional right to privacy—extended to both married and single women.

2. This right was first discussed and developed in Warren & Brandeis, The Right to Privacy, 4 Harv.L.Rev. (1890).

3. Even using this standard of waiver, Miss Drake cannot be said to have waived the right to sue in tort for invasion of privacy under the circumstances of this case. At no time did she publicly discuss her sexual activities. Moreover, she requested and received a private hearing before the Board of Education and only admitted to sexual activity under direct questioning from the Board's lawyer. Clearly, the Board of Education may not assert as a defense in an invasion of privacy action that the plaintiff has waived the right to privacy by prosecuting the lawsuit and thus bringing to public attention the private matter in question. Like the constitutional right to privacy, the Warren-Brandeis right to privacy is not equivalent to a right to secrecy—involving secrets which once revealed forever defeat the underlying right.

Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

Therefore, under the circumstances of this case, it would be an egregious error for this Court to conclude that the plaintiff, Drake, had waived her constitutional right to privacy.[4] While there is some dispute over the facts, it would appear that the question of Miss Drake's pregnancy came to the Board's attention because her private physician breached his confidential relationship and reported her condition to the Board.[5] Once the Board notified Miss Drake that they intended to dismiss her, Miss Drake exercised her right to have a private hearing before the Board. Only within the closed proceedings before the Board, where her job was at stake, did Miss Drake discuss her sexual relations, and then only in response to direct questioning by the Board's lawyers.[6] The waiver of a constitutional right does not occur by inadvertence or under duress. Thus, the only permissible conclusion from the record that is presented to the Court in this case is that the plaintiff has fully preserved her constitutional right to privacy throughout the proceedings.

VARNER, District Judge (dissenting).

I respectfully dissent from the conclusion of my brothers that Miss Drake is entitled to reinstatement as a public school teacher. I cannot agree that Miss Drake, at the time of her hearing, a public school teacher whose morals were street talk in Florala, had any remaining right of privacy. If she had such a right, I think it was subrogated to a strong and compelling State interest in the morality of the State's public school system itself.

Miss Drake, after full administrative hearings, was discharged by the Defendant Board of Education pursuant to the provisions of Code of Alabama, Title 52, § 358.[1] She was specifically charged with being pregnant without benefit of marriage pursuant to the term "immorality" in the statute. We are asked to make private a matter publicized by the very nature of the public interest in the public employment of one who asserts her private rights.

In the instant case, there was evidence from which the Board may have found that Miss Drake was immoral and that such conduct interfered with her teaching ability. The Board found her guilty of "immorality", in the word used by the statute without specifying whether it implicitly found a nexus with her teaching ability. Her claim that her sexual conduct was private paled when she admitted that it was publicly discussed in Florala. Rumor of immorality of a public schoolteacher in a small town travels fast and has a larger impact on the educational process than in a city. It is difficult to see how a Court can require of a Board composed of laymen the niceties of charging and making specific findings of everything that may be required in the way of constitutional niceties, particularly when those requisites are not called to their attention. Rather, it seems more appropriate to me that the Plaintiff, having the burden of

4. The constitutional right to privacy does not involve the right to keep secret matters that are of an intimate or personal nature. Rather this right involves the creation of a zone of protected activities free from governmental intrusion.

5. The Hippocratic Oath provides that "whatsoever you shall see or hear of the lives of men that is not fitting to be spoken, you will keep inviolably sacred." In this instance, Dr. Ray Evers, Miss Drake's private physician, provided the Board of Education with information about her private medical condition without any communication of his inten-

tions to the patient. In this connection, see Horne v. Patton, Ala., 287 So.2d 824 (1973).

6. See transcript of the hearing before the Covington County Board of Education at pages 19–20 (May 22, 1973).

1. § 358. *Grounds for cancellation of employment contract.*—Cancellation of an employment contract with a teacher on continuing service status may be made for incompetency, insubordination, neglect of duty, immorality, justifiable decrease in number of teaching positions, or other good and just cause; but cancellation may not be made for political or personal reasons.

proof,[2] should be required to prove that her discharge was constitutionally defective. The technical defect, right of privacy, on which the majority relies, was not pointed out so that the Board might call for and specifically consider evidence thereof at the time of the hearing. It is difficult for this Court to learn from the evidence how Miss Drake's secret first became a public rumor associated with a public figure. It is enough to interfere with operation of a school system that it did.

I, therefore, cannot say that the Board's failure to specifically find that her right of privacy was not invaded was fatal. It seems to me that this Court should presume the propriety of the Board's finding of immorality in the absence of the Plaintiff's establishing that some element thereof was not proved. To require compliance to specific constitutional language by a lay board is, to me, a technical exercise in futility. Plaintiff has alleged that the "immorality" clause of the State Tenure Act is unconstitutional on its face and as applied to her and that her right of privacy was violated. In my judgment, she failed to prove these allegations. For aught that appears in the record, the statute was constitutionally construed and applied, and the right of privacy, if it existed, was subrogated to a compelling State interest. This Court has no duty to presume the impropriety of the action of a lesser court or administrative body until the impropriety thereof is clearly established by the evidence. United States ex rel Harris v. Ragen, 177 F.2d 303 (7 C.C.R.); Panhandle E. Pipeline Co. v. F.P.C., 179 F.2d 896 (8 C.C.A.); see Modern Fed. Prac.Dig., Adm.Law, Key No. 499.

## RIGHT OF PRIVACY

Miss Drake insists, and my brothers agree, that the whole proceeding invaded her constitutional right of privacy and

that her release from duty was, therefore, impermissible.

Speaking of the right of privacy in this State, the Supreme Court of Alabama in Smith, et al v. Doss, 251 Ala. 250, 37 So.2d 118, stated the following:

"[1] The general nature of the right of privacy is described in 41 Am.Jur. p. 925. It has been defined 'as the right of a person to be free from unwarranted publicity' or 'the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities in such manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.' 41 Am.Jur. p. 925; 54 C.J. p. 816. Its violation is a tort. * * *

Dean Pound wrote in 1915 in 28 Har. Law Rev. 362, '[u]nwanted and unsolicited publicity with respect to private matters of purely personal concern is an injury to personality. It impairs the mental peace and comfort of the individual and may produce suffering much more acute than that produced by a merely bodily injury. A man's feelings are as much a part of his personality as his limbs.'

"[2, 3] But there is a conflicting principle in that the 'white light of publicity safeguards the public' and 'free disclosure of truth is the best protection against tyranny.' 'Frequently the public has an interest in an individual which transcends his right to be let alone' and 'since the whole is greater than its component parts, private rights must often yield to public interest.' Michigan Law Review, Vol. 39, p. 526. The right of privacy ' * * * does not exist * * * in connection with the life of a person in whom the public has a

---

2. Brooks v. School District of City of Moberly, Mo., 8 Cir., 267 F.2d 733, cert. den. 361 U.S. 894, 80 S.Ct. 196, 4 L.Ed.2d 151;

Buford v. Morgantown City Board of Education, D.C.N.C., 244 F.Supp. 437.

rightful interest, nor where the information would be of public benefit.'"

The Supreme Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, and in Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201, held the Texas and Georgia criminal abortion statutes unconstitutional as applied on the ground that a pregnant woman has a right of privacy, broad enough to encompass a woman's decision whether or not to terminate her pregnancy, Roe v. Wade, supra, 410 U.S. at page 154, 93 S.Ct. 705, 35 L.Ed.2d 147, but that this right of privacy is subject to State regulations and must be weighed against important or compelling State interests (410 U.S. at page 154, 93 S.Ct. 705, 35 L.Ed.2d 147). The Court articulated as follows:

"Where certain 'fundamental rights' are involved, the Court has held that regulation limiting these rights may be justified only by a 'compelling State interest,' Kramer v. Union Free School District, 395 U.S. 621, 627, 89 S.Ct. 1886' [1890], 23 L.Ed.2d 583 (1969); Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322 [1331], 22 L.Ed.2d 600 (1969); Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790 [1795], 10 L.Ed.2d 965 (1963);" Roe v. Wade, supra, 410 U.S. at page 155, 93 S.Ct. at page 728.

The Court further recognized the following:

"At some point in pregnancy, these respective interests become sufficiently compelling to sustain regulation of the factors that govern the abortion decision." Roe v. Wade, supra, 410 U.S. at 154, 93 S.Ct. at 727.

While the State interests, referred to in *Roe,* in preserving and protecting the health of the pregnant woman and in protecting potential life were not, within themselves, compelling in the early stage of pregnancy found to exist in the instant case, the State has a strong interest in the sanctity of the educational process and, therefore, the effectiveness of each teacher.

"The teacher is entrusted with the custody of children and their high preparation for useful life. His habits, his speech, his good name, his cleanliness, the wisdom and propriety of his unofficial utterances, his associations, all are involved. His ability to inspire children and to govern them, his power as a teacher, and the character for which he stands are matters of major concern in a teacher's selection and retention." Goldsmith v. Board of Education, 66 Cal. App. 157, 168, 225 P. 783, 787; Board of Education v. Swan, 41 Cal.2d 546, 553–554, 261 P.2d 261. See Moser v. State Board of Education, 22 Cal. App.3d 988, 101 Cal.Rep. 86.

Obviously, there is a strong public interest in elimination of unfit schoolteachers. Beilan v. Board of Education, 357 U.S. 399, 406–408, 78 S.Ct. 1317, 2 L.Ed.2d 1414; Adler v. Board of Education, 342 U.S. 485, 493, 72 S.Ct. 380, 96 L.Ed. 517. The problems associated with unmarried women who have become pregnant and seek abortions is commonly known and is demonstrated in both the *Doe* and the *Roe* cases by the fact that the women involved were allowed to prosecute their cases in assumed names. The loss by a teacher of the respect of her students associated with her known pregnancy without marriage is, in my judgment, so obviously a deterrent to the teaching ability of such a teacher as to be within the judicial knowledge of this Court. The Board of Education must have known that Miss Drake would have encountered grave problems. In my judgment, there was and is a compelling State interest justifying termination of Miss Drake's employment under the circumstances.

As long as a public schoolteacher's affairs are private, they are protected from invasion by the right of privacy. Such an invasion is an invasion of a constitutional right and affords a cause for bringing suit in tort against him who invades the right. See Smith v. Doss, (1948), 251 Ala. 250, 37 So.2d 118, citing with approval Cason v. Baskin, et al,

155 Fla. 198, 20 So.2d 243, 168 A.L.R. 430. However, once the private affairs, whether good or bad, of a public schoolteacher become public and by whatever means, they reflect upon the school system itself. They interfere with teacher efficiency and justify application of the rules: (1) that there is a compelling "public interest in eliminating of unfit schoolteachers", Beilan v. Board of Education, supra; and (2) that the right of privacy "does not exist * * * in connection with * * * a person in whom the public has a rightful interest * * *," Smith, et al v. Doss, supra. The effectiveness of the school system must not be subjugated to the rights of one teacher. Her remedies, if any, lie in other proceedings.

Several Circuit Courts have reviewed administrative discharges for immorality or related causes. The District of Columbia Circuit, in overruling a discharge by the Civil Service Commission for immorality (over Judge Tamm's dissent) in Norton v. Macy, 135 U.S.App. D.C. 214, 417 F.2d 1161, 1167, after recognizing reluctance at overruling an administrative discharge, stated:

"A reviewing court must at least be able to discern some reasonably foreseeable, specific connection between an employee's potentially embarrassing conduct and the efficiency of the service."

Surely problems, associated with loss of the students' respect because of public knowledge of the pregnancy, are reasonably foreseeable and have a specific connection with the efficiency of the educational program. See also Anonymous v. Macy, 398 F.2d 317 (5 C.C.A.1968), in which the Fifth Circuit made short work of affirming Judge Grooms' opinion and said:

"Counsel for appellant, * * * argue * * * that homosexual acts constitute private acts upon the part of such employees, that they do not affect the efficiency of the service, and should not be the basis of discharge. That contention is not accepted by this Court. See Hargett v. Summerfield, 100 U.S.App.D.C. 85, 243 F.2d 29 (1957)."

Miss Drake admitted at the original hearing that this matter was talked all over the streets of Florala. Her effectiveness as a public schoolteacher would, obviously, have been thereby curtailed.

I cannot agree with my esteemed Brothers that "the evidence upon which the Board based its cancellation of Drake's employment contract had its source in disclosures from her own physician solicited by Superintendent King." There is no showing that this talk was limited to the discussion by the Board of Education or its members. A bookkeeper for the county first heard and reported the rumor to Superintendent King on March 7. The fact that the "rumor", as early as March 7, was widely enough spread to have reached the Superintendent and was confirmed by the doctor,[3] considered along with Miss Drake's admissions that her reputation was publicly discussed, was ample evidence to support a conclusion by the Board that Miss Drake's privacy was de-

3. In Alabama, a doctor has no legal privilege as to communications with his patient. Horne v. Patton, Ala., 287 So.2d 824 (1973); Gullege v. Mitchel, 242 Ala. 342, 6 So.2d 22; Dyer v. State, 241 Ala. 679, 4 So.2d 311; Beecher v. State, 288 Ala. 1, 256 So.2d 154, 164, reversed on other grounds 408 U.S. 234, 92 S.Ct. 2282, 33 L.Ed.2d 317. If he wrongfully violates the Hippocratic Oath or any rule of ethics in responding to inquiries about a public rumor concerning a public schoolteacher laden with the public interest, the law would provide a remedy exclusive of interfering with the educational process. Horne v. Patton, supra. The Court in *Horne* states a new rule in Alabama as follows:

"It is thus that it must be concluded that a medical doctor is under a general duty not to make extra-judicial disclosures of information acquired in the course of the doctor-patient relationship and that a breach of that duty will give rise to a cause of action. It is, of course, recognized that this duty is subject to exceptions prompted by the supervening interests of society, as well as the private interests of the patient himself."

mised before it was conceived as a theory in this case. I would hold, therefore, that, because of the publicity, as well as the public interest, obviously associated with Miss Drake at the time of the hearing before the Board of Education, Miss Drake had no privacy and, therefore, had no right to privacy.

There is a strong and compelling State interest that a county superintendent of education investigate rumors which may affect teacher efficiency and, upon confirmation thereof, report it to his board of education. The Board then has a duty to determine whether the infraction, if any, interferes with the educational process and the degree of punishment necessary to correct the interference, if any.

I, therefore, respectfully dissent.